[Crim. No. 56. Fourth Appellate District.—February 10, 1932.]

THE PEOPLE, Respondent, v. RALPH PHILLIPS, Appellant.

Raymond E. Hodge and H. E. Thompson for Appellant.

U. S. Webb, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

BARNARD, P. J.—The appellant was charged in the first count of an information with the murder of one Ted Padgett and in a second count of the same information with assault with intent to commit murder upon one Orville Padgett. The jury found him guilty of murder in the second degree on the first count, and acquitted him on the second count. This appeal is from the judgment and from an order denying a motion for a new trial.

The first point raised is that the evidence is not sufficient to support the verdict. The appellant was employed on a used car lot owned by one Copeland, in the city of San Bernardino. On the rear of this lot was a small brick building used as an office and immediately adjoining the lot was a service station operated by one Sievers. Late in the afternoon of January 4, 1931, a number of men, including Sievers, Orville Padgett, Ted Padgett, the appellant, the appellant's brother Frank Phillips, and one Gingstrom, were engaged in gambling in the brick office of the used car lot. The game broke up about 5:30 o'clock and several of the men left. Shortly thereafter, the appellant accused Orville Padgett of cheating, whereupon a general fight ensued during which the two Padgetts knocked down the two or three men that remained and left the premises. The appellant testified that on the morning of January 4th one Lorton had told him that he had brought back two shotguns which he had borrowed from Copeland and that he had left them at the service station next door. He testified that he planned to go hunting the following Tuesday night and that, immediately following the fight above referred to, he went over to the service station to get the guns. He found the two guns there, a 20-gauge pump shotgun and a 12-gauge automatic shotgun. He picked them both up and started out and then happened to remember that the automatic gun was such a dangerous gun that he did not want his brother to use it, so he took it back into the service station but took the pump gun with him. He also took with him a hunting vest "full of shells", which he had never seen before. On his return to the brick office he tried the

hunting vest on and, since that was the easiest way to carry it home, left it on and put his coat on over it. While he and his brother were sitting in the office and about fifteen or twenty minutes after the Padgetts had left, he observed Ted Padgett walking into the lot. When he saw Ted Padgett coming he testified, ''I figured he had come back to start another fight and I picked up the gun and slipped four or five shells in it, and I walked over and sat down on the desk and had the gun behind me.'' There was evidence that the two Padgetts had returned to the lot to look for a wrist watch which one of them had lost, and it is undisputed that Orville remained in their car across the street while Ted entered the lot. Appellant's testimony as to what followed is that Ted Padgett appeared in the office and made some statement about ''finishing the job''; that he ordered Padgett off the lot, at the same time picking up the gun; that they both went outdoors where Padgett called to his brother and then backed him (appellant) toward a building to the north; that he told Padgett he would shoot if he did not get off the premises; that about that time he saw Orville Padgett begin a tussle with Sievers and then both Padgett brothers jumped on to Sievers; that appellant called to his brother to go into the office and phone the police; that appellant's brother entered the office and almost immediately Ted Padgett left his attack upon Sievers, came over and struck the appellant so that the appellant fell down, and then followed Frank Phillips into the office; that appellant knew Ted Padgett would harm his brother Frank and that just as Ted entered the doorway of the office building, he (the appellant), while still on his knees and about seven or eight feet from the door, raised his gun and fired at the legs of Ted Padgett in an attempt to stop him; that Ted did not stop but turned to the right in the office; that he jumped up and ran to the door of the office, and just as he got there his brother fell over with blood streaming down his head; that he then saw Ted Padgett facing him (appellant) slightly stooping, with something in his hand that looked like a piece of iron and ''just fixing to deliver another blow''; that then, in order to prevent his brother being killed or greatly injured he fired point blank at Ted Padgett, aiming for his heart; that immediately thereafter he heard some

remark from Orville Padgett, who was some fifteen or twenty feet away near a fence; that he thought Orville had something in his hand that looked like a gun; that he then fired several shots at him; that Orville Padgett dropped and at that time Mrs. Sievers appeared and assisted her husband to his feet; and that appellant and his brother and Mr. and Mrs. Sievers then went over to the adjoining service station. He further testified that he then placed the gun in Siever's car; that he and Mrs. Sievers assisted Mr. Sievers into the car; that he told his brother to get in the front seat; that he himself got in and drove; that he took the Sievers to their home; that he told them he would take their car back and leave it at the lot; that instead of taking the car to the lot he and his brother immediately drove by way of Victorville and Barstow to Kingman, Arizona, arriving there the next morning; and that the following day he and his brother separated, his brother telling him that he was going to their mother's home in West Virginia, that he would keep in touch with their mother and that if appellant should ever need him he could locate him through the mother. He testified that he gave his brother $4.85; that because he did not have money enough to buy gasoline, he left the car underneath a railroad bridge and started home on foot; that he got rides part of the way; and that he arrived in San Bernardino on January 17th, in the evening. He remained in San Bernardino over one day, leaving the following night. While there he learned that one of the Padgetts was dead and the other was wounded. He stated that his purpose in again leaving San Bernardino was to try and find his brother. When asked why he wanted to find his brother, he replied: "Because he had been charged in this the same as I had. After I found there was a murder I realized what a bad mistake I had made in ever letting him go away. I knew if I stayed in jail I would have no chance of ever finding him, so I decided to start to find him." He testified that he then went to El Paso and searched at various places for his brother for over a month. He returned to San Bernardino on March 17th and surrendered to the sheriff's office.

While the appellant thus admits firing the shot which killed the deceased, and while he contends his act was

justifiable, there is considerable evidence justifying a contrary conclusion by the jury. There is evidence that when the Padgetts returned, Orville remained in the car across the street while Ted entered the used car lot and walked toward the office; that appellant and Sievers were standing on the lot and walked with Ted to the office; that two or three minutes later these three men came out of the office and walked about halfway to the street, where they stopped and talked; that after talking for several minutes Ted called to Orville, saying that the men wanted to talk with him; that Orville walked over to them and just as he entered the lot Kingstrom came along; that all of them entered the office except the appellant; that Sievers and Orville started wrestling inside the building and went outside still wrestling; that Ted came over and tried to pull Sievers off of Orville; that Kingstrom came out of the office and he and Ted began wrestling near the office door; that just as they were getting to the office door Orville and Sievers stopped wrestling and at that time the appellant came around from the back of the office with a shotgun in his hand; that appellant shot at Orville, striking him on the left leg below the knee; that appellant then fired into the office and turned around and fired another shot at Orville; that Orville fell to the ground and then crawled over to the office door; that as he got to the door he saw his brother lying inside; that he crawled on his knees to the desk and tried to telephone; that as he took the receiver off the hook he heard an explosion and felt a blow hit him on the side of the face; that this came from a window on the east side of the office; that the blow knocked him over against the south wall and he fell to the floor; that he again tried to phone but one eye was gone and the other was full of blood so he could not see the number; and that a few minutes later the police came and took him away in an ambulance. A large part of this evidence is the testimony of Orville Padgett, which the appellant argues could not have been considered by the jury, inasmuch as the jury found the appellant not guilty on the second count of the information. This evidence was before the jury and, regardless of the jury's reason for not finding the appellant guilty on the second count, it relates also to the first count and we cannot hold that the jury could

not and did not believe it. In addition, there was other evidence from which the jury may well have concluded that the appellant's version of the facts surrounding the shooting was not entirely true. The testimony of Sievers and Kingstrom, who were witnesses for the appellant, contains many things not consistent with the story told by the appellant. The appellant admitted that he shot five times. Four empty shells were found on the premises and it could well be that the fifth was shot through the window at Orville in accordance with Orville's testimony, and that this shell was never thrown from the gun and was carried away with the gun by the appellant. The window on the east side of the building was broken and there were pieces of glass on the desk. There were a number of fragments of lead embedded in the window casing around the outside of the east window and from the appearance of things, a shot had been fired from the outside to the inside of the building. The left side of Orville's face from his forehead to his neck contained about one hundred shot holes, the contents of one eye had run out and the sight of the eye was totally destroyed. His ear was all cut up. There were also two large wounds in the calf of his left leg, one of them four inches long, the muscle and flesh blown off, and the other exposing deep structures of the leg in an area larger than a man's hand. In view of all of the evidence, the jury could well have believed that the wound on Orville's head was received from a shot through the window, and many of the circumstances are inconsistent with appellant's story. While the death of Ted Padgett was caused by a gunshot wound through the chest, leaving a wound large enough to admit the ordinary fist, there was also a tear on his left thigh three inches long, one inch wide and one inch deep. Appellant testified that he shot at his legs the first time and aimed at his heart the second time, as he saw Ted about to strike his brother with an iron in his raised hand. While there were a number of tire irons in the office which were available to Ted Padgett, the jury could well have refused to believe that a man who had received such a shot wound in his thigh, could or would have picked up such an iron, knocked down another man and prepared to continue his attack on his prostrate foe, while paying no attention to his wound, or

to the other man within seven or eight feet who was armed with a pump gun and who had already shot him, and that all this could occur while the other man was rising from his knees and coming a distance of seven or eight feet. ■ The appellant's evidence, after a careful reading and comparison with all the evidence, is not convincing, and his explanation of his flight, including his return and second leaving under cover of night, is far from satisfactory. While it is in part conflicting, it cannot be held that the evidence is not sufficient to support the conclusion reached by the jury.

■ The second point raised is that the court erred in refusing to grant a new trial on the ground of misconduct of the jury. This alleged misconduct consisted in the supposed reading by the jury of an article that appeared in a San Bernardino paper on the morning of the fifth day of the trial under the following headline: "Proposal of the defense attorney to plead Phillips guilty on manslaughter charge rejected." At the opening of court on the morning in question, the appellant called the court's attention to this article and requested the court to interrogate or permit him to interrogate the jurors as to whether or not they had read this headline and, if so, whether or not it would influence them in any respect. The court refused this request and properly so. (*People* v. *Fernandez*, 3 Cal. App. 689 [86 Pac. 899].) It appears that at the commencement of the trial the court admonished the jury not to read any account of the trial or the progress thereof that might appear in any newspaper, and at the close of the trial the court instructed the jury, after referring to the admonition he had previously given them, that if they had inadvertently noticed any headlines or articles in reference to this case, they must wholly disregard them and that their verdicts must be based solely upon the evidence introduced in court, together with the instructions, and must not be founded upon any matters that they might have heard or read outside of court. ■ On his motion for a new trial the appellant filed the affidavit of one of his counsel deposing that this article appeared in the paper in question, setting forth the names and addresses of the jurors, stating that the article complained of was false and untrue and damaging and prejudicial to the defendant,

and "that most of said jurors inadvertently read said article in their attempt to look for news items". It is then alleged, on information and belief, that this article had great weight with the jury and that the tenor of the article had been repeated by some of the jurors in the jury-room. While this affidavit sets forth the names of all of the jurors, it contains no statement that any particular juror or jurors had read the heading or the article. It merely states that most of the jurors had read it. It perfectly appears from the entire affidavit that this is a conclusion on the part of the affiant and that it amounts to no more than an assertion of his opinion and belief to that effect. This is not sufficient (*People* v. *Feld*, 149 Cal. 464 [86 Pac. 1100]; *People* v. *Findley*, 132 Cal. 301 [64 Pac. 472]). Viewing the matter in the light most favorable to the appellant, neither error nor substantial injury is affirmatively made to appear. (*People* v. *McGann*, 194 Cal. 688 [230 Pac. 169].)

▆ Appellant next complains of the refusal of the court to give nine instructions, which are set out in full. The appellant does not set forth the other instructions which were given upon the same subjects, and makes no argument other than that the instructions so refused were correct; conceding, however, that some of them repeated parts of other instructions. We have carefully gone over each of these refused instructions and find that every material part of them was included in other instructions given by the court, and to a large extent the subject matter of these refused instructions are included in such instructions as were given by the court at the request of the appellant. The instructions as given by the court were unusually complete and fair. Complaint is also made that the court struck out the last four lines of another instruction which was given by the court at the request of the appellant. The wording of the portion struck out was objectionable but the essence and intent of this portion was fully included in the part that was given.

▆ It is next urged that the court erred in refusing to permit the appellant to amend his motion for a new trial. The verdict of the jury was returned on May 23, 1931, and the matter came up for passing sentence on May 27, 1931. On that day appellant filed a motion for a new trial on a

number of grounds, not including the discovery of new evidence. Hearing on the motion was continued to June 5, 1931. On that day appellant requested leave to amend his motion for a new trial by setting forth the additional ground of newly discovered evidence, and also requested a continuance of one week for the hearing of the motion. Both of these requests were denied, as was also the motion for a new trial. In support of his motion to amend and for a continuance of the hearing, counsel for appellant stated that three days before, information had come to him that a certain witness was available in Oakland "who knew something very material in this case"; that they had sent a man by machine to get this witness but they had not yet returned; that they apprehended that this witness would be there within a week so that they could present his affidavit "as to what testimony he could have given or would give". Counsel then went on to state that he expected to show by this witness that the witness was at the place in San Bernardino to which the two Padgetts went after the first quarrel at the used car lot, and that Ted Padgett there got a gun. He also stated that he expected to show that this witness followed Padgett back to the used car lot and "saw something that transpired there, we don't know how much of the occurrence but after the occurrence he picked up his gun at the lot". He then stated that this information did not come to them until after "the time that our first motion was made". The appellant then requested further time in which to secure affidavits. The hearing on this motion for a new trial was held on the ninth day after the motion was made. Assuming, but not deciding, that the appellant had the right to amend his motion at that time, it can hardly be held that it was the duty of the court to permit the amendment and to grant a continuance without a substantial showing of the necessity therefor. This would include not only a showing of diligence on the part of the appellant, but also some substantial showing that new evidence was available, that it was material, and that further time was necessary in order to secure affidavits. No attempt whatever was made to show diligence in this instance, why the witness was not available before, or why the information they had then obtained was not available at an earlier time. No definite person was named or in any way identified. Coun-

sel frankly admitted that he did not know what the evidence of the unnamed person in Oakland would be. So far as the events that transpired at the time of the killing are concerned, it was not shown that any material evidence could be produced through this witness, the extent of counsel's claim being that the witness saw something of what transpired there although he did not know how much. While counsel stated that he expected to show by this witness that Ted Padgett armed himself during the interim between the two fights, this is not material, since the appellant himself testified as to what occurred and at no time did he make any claim that Padgett had a gun, that he produced one, or that the appellant feared that he had one. His only evidence to the effect that Padgett used anything other than his fists was that just before the fatal shot was fired, Padgett had something in his hands which looked like a tire tool. The entire matter, as presented by the appellant to the court, amounts to no more than a statement by counsel that while he could not then say that he had found new evidence which was material it was possible he might later produce such new evidence if the court would permit the amendment and grant him an extension of time. Assuming, as contended by appellant, that it would have been the duty of the court to have granted the motions upon a sufficient showing, we are not prepared to hold that the court violated its discretion and committed prejudicial error in refusing to postpone the pronouncing of judgment beyond the fifteen-day period provided by the code, on this general statement by counsel that he might or hoped to find some new evidence (*People* v. *Urquidas,* 96 Cal. 239 [31 Pac. 52]; *People* v. *Yeager,* 194 Cal. 452 [229 Pac. 40]; *People* v. *Brennan,* 35 Cal. App. 101 [169 Pac. 239]). █ It is argued that appellant had a right to amend his motion, that the denial of this right was prejudicial error, and that this court cannot consider whether or not a sufficient showing was made as to the new evidence, but must presume that a sufficient showing would have been made, had the court permitted the amendment. The court was hearing a motion for a new trial, having given nine days for preparation, and the appeal we are now considering is from the order denying a new trial. While the court refused to permit an amend-

ment of the motion, it permitted counsel to make his showing as to what new evidence he expected to secure, and then refused a further continuance. In our opinion the showing made was not sufficient to indicate that the court abused its discretion in denying a new trial without granting a continuance (*People* v. *Brennan, supra; People* v. *Yeager, supra*).

It is next urged that the court erred in limiting the argument of counsel to two and one-half hours on a side. All that the record shows is the following:

"The Court: How much time do you gentlemen desire for the argument?

"Mr. King. We will not require more than two hours.

"Mr. Hodge: We will not require more than three hours. I do not like to be limited.

"The Court: I think two and one-half hours to a side should be sufficient."

Following that, an adjournment was taken until the next morning, when the argument proceeded. However, in support of their motion for a new trial, counsel submitted their own affidavits to the effect that after conferring together they decided that even three hours was inadequate, that they thereupon followed the court into his chambers, told him that the time allotted was too short in view of the circumstances, requested that no limitation be placed upon the time of argument, and that this request was denied by the court. These affidavits then set forth that six days were consumed in the trial of the case, that twenty-seven witnesses testified for the prosecution and thirty-two for the defense, that the daily transcript comprised about 950 pages, and that it was utterly impossible to submit a full and fair argument of the case in the time allotted. It does not appear, however, that any request for additional time was made in court nor that anything else was said in court other than above set forth. If error was committed it was committed at the time of the trial, and the most that the record shows is that counsel for appellant stated that they would not require more than three hours and the court replied that two and one-half hours "should be sufficient". Even if this could be interpreted as a definite limitation, no objection was made in court and no request for more time was made. Counsel should not be allowed to acquiesce in

such a manner and then, when the verdict of the jury is unfavorable, rely upon the claim of a violated right, to have the whole case tried over again. If we go outside the record and accept the statement that the court in chambers refused to permit an argument without any limitation, it still does not appear that a miscarriage of justice has occurred. The appellant admitted firing the fatal shot involved in the one count and admitted the assault involved in the other count. The only question left is whether the circumstances justified his actions. The issues were neither many nor complex and it does not appear that they could not have been fairly presented to the jury in two and one-half hours. As far as that is concerned, it does not appear that counsel for appellant did not take far more than that time. The argument of counsel for the appellant is not set forth and there is nothing to show that all of the facts of the case were not fully and adequately brought to the attention of the jury, and nothing exists to indicate that any longer argument would have been likely to change the result. In our opinion, an abuse of discretion on the part of the court is not shown by the record (*People* v. *Prewett,* 40 Cal. App. 416 [180 Pac. 844]; *People* v. *Valencia,* 85 Cal. App. 306 [259 Pac. 361]).

The last point raised is that the court erred in keeping the jury out for seventy-eight hours and in telling the jury that their verdicts must be returned at one time. It appears that during their deliberation the jury returned into court and requested that certain testimony be read to them and then asked the court if they were permitted to agree on one charge and disagree on the other. The court informed them that they could bring in a verdict on one count and report a disagreement on the other, but that the entire matter must be disposed of at one time by their verdicts. Appellant argues that they might have reached an early verdict on one of the counts and desired to return that verdict at once in order that no juror could later change his opinion. When a verdict has been agreed upon by a jury and received by the court, the jury must be discharged (Pen. Code, sec. 1164). We know of no law that would have permitted the court to accept a verdict on one count of this information and then send the jury out for a further consideration of the other count. In

any event, no error is shown. The mere fact that the jury was kept out for seventy-eight hours before they reached a verdict is not sufficient to show that the jury was coerced into a verdict (*People* v. *Selby*, 76 Cal. App. 715 [245 Pac. 792]).

We conclude that the defendant had a fair trial, and we find nothing in the voluminous record to convince us that a miscarriage of justice has occurred.

The judgment and order appealed from are affirmed.

Marks, J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 24, 1932.