[Crim. No. 7915. In Bank. June 30, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. LEE CLYDE LAMBRIGHT, Defendant and Appellant.

Burton Marks, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, J.—Defendant appeals from a judgment of conviction entered on a jury verdict finding him guilty of two counts of second degree murder. His appeal from the order denying his motion for a new trial is dismissed. (Pen. Code, § 1237.)

Defendant had known Alys Tuttle since about 1958. She was separated from her husband and was living with Max Navarro. Alys sometimes lived at defendant's cottage for periods of a few days on occasions when she had quarreled with Navarro. Defendant and Alys were both heavy drinkers and spent much of their time together consuming alcohol. They also had sexual relations. Defendant apparently had accepted the fact that Alys chose to live with Navarro, although defendant at one time sought to have Alys marry him after she obtained a divorce from her husband.

At about 6:30 a.m. on the morning of February 7, 1963, defendant arrived at Navarro's cottage with a bottle of whiskey, which defendant and Alys consumed during the morning. Navarro had already left for work when defendant arrived. Ernest Mitchell, a fellow employee of Navarro's, arrived at the cottage at about 10 a.m., apparently to drive Alys to the laundromat as a favor to Navarro. At approximately 11:30 a.m. a single shot fired from defendant's Mauser rifle passed through Alys and Mitchell killing both of them. Defendant returned to his cottage and attempted to take his life with the rifle.

Defendant testified that the shooting was accidental. He had purchased the rifle on February 2, 1963, for deer hunting, and after leaving the store loaded the rifle to see if he

knew how to do so. He removed the shells, but had difficulty replacing them in their box and put them back in the rifle. He then wrapped the weapon in its original wrapping paper and put it in the trunk of his car. He thought he engaged the rifle's safety mechanism.

While talking with Alys and Mitchell on the morning of February 7, defendant told Alys that he wanted to show her his new rifle. Alys apparently liked venison, and defendant claimed that was a reason for his plans to go hunting. Defendant went out to the car to get the rifle and when he returned Alys was in the kitchen with Mitchell. Defendant entered the living room through the front door, stated ''Here is the gun,'' and proceeded to unwrap it. He first grasped the muzzle with his left hand while taking the paper from the stock of the rifle with his right hand. He then held the rifle with his right hand and started to remove the paper from the muzzle. At this instant the weapon discharged as Alys and Mitchell were returning to the living room through a doorway from the kitchen and were facing defendant with Alys in front of Mitchell. Defendant observed that Alys was dead, and in his grief over her death sought to take his own life. He claimed that he was intoxicated at the time of the shooting. Autopsies showed an 0.26 per cent of alcohol content in Alys's blood, but no indication that Mitchell had consumed any alcohol.

The prosecution established that the bullet passed approximately horizontally through the victims at a height of about 51 inches. There were no powder burns on either body. An expert testified that it took approximately five pounds of force to operate the trigger, and the jurors were allowed to inspect the weapon and test the trigger action. It was shown that the ammunition purchased by defendant was inappropriate for deer hunting[1] and that the deer hunting season did not begin until September or October.

At the outset of the trial the trial judge instructed the jury as follows: ''Some judges request juries during the trial not to read newspaper articles or listen to radio news broadcasts or view television newscasts pertinent to the trial that they may be sitting on. I don't think that is proper, I don't think a Judge has a right to tell a jury that they can't read the newspaper, that they can't listen to the radio, that they

---

[1]Defendant purchased a military round of steeljacketed cartridges, which are usually sold for target shooting and are illegal for deer hunting.

can't view television. Now, assume, ladies and gentlemen, that during this trial there will be mention of this case in the newspaper and in perhaps radio news broadcasts or television newscasts, you have a right to listen to those and to view them. I believe, as you believe, in freedom of the press. This is one of our constitutional guarantees, however, I remind you that you must not consider that, if you listen to them or if you read about them in the paper, you must simply put yourself in the frame of mind that I would have to put myself in if I were to decide this case without a jury and that is that I can't consider it as far as my evaluation of the evidence is concerned. It just means nothing. My evaluation of the evidence must come from the lips of the witnesses here in the courtroom and from such exhibits as may be introduced in the case, so if you do listen to things like that, just remember that the law imposes upon you the obligation of deciding the case solely and entirely on what you hear from the witnesses here in the courtroom and from the exhibits in the case.''

During the trial the prosecution sought to introduce hearsay testimony of Max Navarro of statements Alys made to him. Upon objection by defense counsel, the court excused the jury and then considered Navarro's testimony. Navarro related that about two weeks before the killings Alys told him that defendant while drinking had said to her, ''Some of these days I will kill you,'' to which Alys replied, ''You are drunk. You are nuts.'' Navarro further testified that less than a week before the killing Alys told him that defendant had said to her, ''One of these days I will kill you. I could kill you now.'' Navarro said that neither he nor Alys took defendant's threats seriously. The trial court sustained defendant's objection and ruled that this testimony was inadmissible hearsay. The jury returned to the courtroom and the examination of Navarro was resumed.

While Navarro was testifying out of the jury's presence the proceedings apparently remained public. On the following day an article appeared in the San Diego Evening Tribune recounting Navarro's excluded testimony under the headline ''Death Threat Told at Trial.'' This newspaper had a circulation in excess of 100,000 copies daily.

Defense counsel brought the article to the attention of the court and requested that the jury be polled to determine if any of the jurors had read it. The court denied this request. When later raised on a motion for a new trial, the court

rejected the contention that defendant was prejudiced by the refusal to poll the jury regarding the newspaper article. The court stated that the jury had been instructed not to consider extrajudicial evidence, and that defendant had not shown that any juror failed to heed this admonition.

█ It is misconduct for a juror to read newspaper accounts of a case on which he is sitting. (*People* v. *Lessard*, 58 Cal.2d 447, 454 [25 Cal.Rptr. 78, 375 P.2d 46]; *People* v. *Wong Loung*, 159 Cal. 520, 524, 526 [114 P. 829]; *People* v. *Feld*, 149 Cal. 464, 478 [86 P. 1100]; *People* v. *Chin Non*, 146 Cal. 561, 566 [80 P. 681]; *People* v. *Stokes*, 103 Cal. 193, 196-199 [37 P. 207, 42 Am.St.Rep. 102]; see *People* v. *Santo*, 43 Cal.2d 319, 331 [273 P.2d 249]; Pen. Code, § 1181, subd. 2.) █ The trial court therefore erred in instructing the jurors that they had a right to read articles about the trial or obtain extrajudicial evidence by radio or television. The prejudicial effect of this error was not removed by the general admonitions to the jury not to consider such evidence in their deliberations. Had the trial court inadvertently admitted Navarro's testimony concerning defendant's alleged threats, it is unlikely that even an immediate admonition would have cured the prejudicial effect of such inadmissible evidence. This case was a close one, for there was little evidence of defendant's motive or intent to kill, the main issue in the case. Evidence that defendant had threatened to kill Alys relates directly to this main issue, and is of a type that would leave an inerasable impression on the jury. (See *People* v. *Duncan*, 53 Cal.2d 803, 818 [3 Cal.Rptr. 351, 350 P.2d 103]; *People* v. *Hardy*, 33 Cal.2d 52, 61-62 [198 P.2d 865]; *People* v. *Wochnick*, 98 Cal.App.2d 124, 128 [219 P.2d 70]; *People* v. *McKelvey*, 85 Cal.App. 769, 771 [260 P. 397].)

█ Defendant took every step possible to ascertain whether the jurors read the article. In view of the court's erroneous instruction authorizing them to read newspaper accounts of the trial it was very likely that some jurors did read the article. Defendant's request to poll the jury was therefore proper. (Cf. *People* v. *Barthel*, 204 Cal.App.2d 776, 780 [22 Cal.Rptr. 599].) In a case where the jury is correctly admonished not to receive newspaper or other extrajudicial reports of the trial, it may be a proper exercise of discretion for the trial court to refuse to poll the jury regarding any specific news media account of the trial. (See *People* v. *Brac*, 73 Cal.App.2d 629, 636 [167 P.2d 535]; *People* v. *Phillips*, 120 Cal.App. 644, 652 [8 P.2d 228].) In such a situation it

may be presumed in the absence of a showing of misconduct that the jury heeded the court's admonition. (See *People* v. *Feld,* 149 Cal. 464, 478 [86 P. 1100]; *People* v. *Torres,* 185 Cal.App.2d 168, 172 [8 Cal.Rptr. 135].) In the present case, however, the court's original error of allowing the jury to receive extrajudicial accounts of the trial was compounded by the refusal to poll the jury. Since the trial court expressly authorized the jury to read newspaper accounts of the trial, it is reasonably probable that some of the jurors did so and that their misconduct, even though innocent, affected the result.[2] Accordingly, the error was prejudicial. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is reversed.

Gibson, C. J., Schauer, J., Peters, J., Tobriner, J., and Peek, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Presiding Justice Griffin in the opinion prepared by him for the District Court of Appeal. (*People* v. *Lambright* (Cal.App.) 36 Cal.Rptr. 851.)

---

[2]The fact that a newspaper published an account of testimony that the trial court ruled inadmissible raises serious questions as to the propriety of such reporting. Although the protection of the First Amendment of the United States Constitution may extend in some circumstances to press coverage of judicial proceedings, such rights may be outweighed by the defendant's right to a fair trial when the latter right is in clear and present danger of obstruction by the news media. (See *Pennekamp* v. *Florida,* 328 U.S. 331, 334-336 [66 S.Ct. 1029, 90 L.Ed. 1295, 1297-1298]; *Bridges* v. *State of California,* 314 U.S. 252, 259-263 [62 S.Ct. 190, 86 L.Ed. 192, 201-203]. See generally, *Due Process for Whom—Newspaper or Defendant?,* Comment, 4 Stan.L.Rev. 101.) The danger was apparent in this case where the trial judge excused the jury from the courtroom to consider certain evidence and ruled that the evidence was not for the jury's consideration. As stated in *People* v. *Stokes,* 103 Cal. 193, 197 [27 P. 207, 42 Am.St.Rep. 102], ''It is exceedingly unfortunate that a newspaper should publish such an article pending the trial of an important criminal case. Newspaper comments of this character are well calculated to interfere with the due and proper administration of justice. The jurors should not have read the article. The newspaper should not have published it. The publication of such articles during the pendency of important trials serves no good purpose, but, on the contrary, tends to impede and adulterate the stream of justice.'' (See also *People* v. *Gomez,* 41 Cal.2d 150, 161 [258 P.2d 825]; *People* v. *Powell,* 171 F.Supp. 202, 205.)