[Crim. No. 31280. Second Dist., Div. Four. Aug. 14, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
LARWANCE MARVIN KITT, Defendant and Appellant.

## COUNSEL

Paul N. Halvonik, and Quin Denvir, State Public Defenders, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, and Harold E. Shabo, Deputy State Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JEFFERSON (Bernard), J.**—By information defendant was charged with murder in violation of Penal Code section 187. It was alleged in the information that defendant used a firearm—a shotgun—during the commission of the offense, within the meaning of Penal Code section 12022.5 and Penal Code section 1203.06, subdivision (a)(1).

Defendant was tried by a jury after he entered a plea of not guilty. The jury found defendant guilty of first degree murder and found the allegation of a firearm use to be true. Defendant's motion for a new trial was denied. Defendant was sentenced to state prison for the term prescribed by law, the use allegation being stricken on defendant's motion. Defendant appeals from the judgment of conviction.

I

*The Factual Background*

On Thanksgiving 1976, and for a short period prior thereto, Christine Oliphant and Gary Thompson were living with defendant and his wife, Marilyn, in an apartment at 5738 Priory Street in Bell Gardens.

On Thanksgiving Day defendant and Gary Thompson had an argument about a jacket. The argument was a verbal one and no blows were struck.

On the day after Thanksgiving Christine and Gary left the Kitt residence and stayed with a friend. The next morning they went to the residence of Joe Novack and spent the day there. Around 4 p.m. they were watching a football game when Christine heard someone call out—"Bear." Gary was known as "Bear"; he got up and went to the back door.

Christine continued to watch the football game; she heard the sound of gunshot a few moments later. She immediately went to the door and saw defendant standing a short distance away on the other side of a fence with a shotgun. She had seen the gun previously at defendant's home. The gun was broken open and she actually could see only the portion of gun where the weapon is loaded. Christine told Novack to phone the police. She shut the door and went to assist Gary, who had been wounded and was on the floor of the hallway of the Novack home. Gary eventually died because of a penetrating shotgun wound to the left portion of his chest.

About 4:20 p.m. of the day after Thanksgiving, 1976, Jack Rerucha, of the Bell-Cudahy Police Department, was on patrol and received a call about a man with a gun. Rerucha observed defendant standing in the vicinity of 4560 Florence Avenue, with a shotgun lying at his feet. Two shotgun shells were opened next to the gun. Rerucha and another officer, Officer Richards, who had arrived at the scene, approached defendant and ordered him to step back from the gun and to lie down. Upon the approach of the officers, defendant said, "I just shot a man, I think we need an ambulance." Richards asked defendant where the man was and defendant replied that the man was by a Plymouth that was beige in color similar to defendant's shirt. Rerucha stayed with defendant while Officer Richards went over to the Plymouth.

Officer Richards saw a spent shotgun round by the rear portion of the Plymouth. He then saw two other officers running down the driveway of an apartment house south of a nearby fence. They told him a murder had been committed in the apartment building. Richards then went back to the Florence Avenue location where Rerucha was with defendant.

As Richards was placing defendant in Rerucha's car, defendant said: "I told him to quit beating my wife and my kids or I'd get him. I don't know how many times I have told him." Defendant also stated to Richards that he would find an expended round of ammunition on the ground by the Plymouth; that that was where the round had been ejected after

defendant had shot the victim. Richards eventually recovered the shotgun round by the rear fender of the vehicle parked near the Novack apartment.

Richards testified that defendant appeared totally normal and rational during the time he observed defendant.

Rerucha asked defendant if he had left a vehicle at the crime scene and defendant stated that he had walked over to the area from Bell Gardens. Defendant also indicated that if the officer checked by the carport next to the apartments the officer would find a guitar case. Defendant said that he had used the guitar case to carry the gun from Bell Gardens. The guitar case was eventually recovered.

Rerucha testified that defendant appeared to be normal and responded to all questions in a clear and succinct manner.

Subsequent examination revealed the expended shell found by the Plymouth vehicle had been fired from the shotgun observed at defendant's feet.

David Reed, of the Bell-Cudahy Police Department, saw defendant at the jail that night and observed that he appeared to be worried and nervous. Defendant asked him what was going to happen. Reed testified that defendant appeared to be alert and aware of what was happening to him. Defendant also asked the officer to contact his brother so his brother could contact defendant's wife and bring some medicine to the station. Defendant worried that he might have an epileptic seizure if he did not have his medicine. Reed also saw defendant the following night. Defendant was still worried and concerned.

Defendant's defense was primarily that he was unconscious and unaware that he had fired any shotgun blast at the victim. Testifying in support of this defense were defendant's wife, a brother-in-law, his mother, and his mother-in-law. All of these witnesses testified to observing defendant have seizures at different times.

The substance of their testimony was to the effect that after the physical effects of the seizures had ended, it would be some period of time before defendant appeared to be normal. They also testified that at times subsequent to the seizures, defendant would ask what he had done; that he appeared to be walking around without knowing what he was

doing. One of the witnesses testified that it would generally take a half hour or longer for defendant to come back to his "right mind."

Christine testified that during the time that she lived with the Kitts, she had seen defendant go into seizures approximately three times; but she had never seen him get up, walk around and talk in a normal tone while in the midst of a seizure.

Defendant testified in his own defense that when he had seizures he did not know what happened except for what he was told later. He stated in his testimony that he had no memory at all of Gary Thompson or Christine Oliphant; he did not recall them living with him. Defendant stated that he could recall nothing about the day he was arrested or the officers who arrested him. He did not remember talking to any officers. He stated he did not recall taking a gun or a guitar case out of his home. He said that he had no recollection whatever of the morning, afternoon, or night of the day in question—November 27, 1976.

## II

### *Defendant's Contentions on Appeal*

Defendant contends that the following errors occurred which mandate a reversal of his judgment of conviction: (1) the trial court failed, *sua sponte,* to give complete and proper instructions on the issue of unconsciousness; (2) the jury looked at gruesome photographs which had not been admitted into evidence; and (3) the trial court erred in admitting two gruesome photographs whose probative value was outweighed by the danger of undue prejudice.

## III

### *The Adequacy of the Trial Court's Instructions on the Issue of Unconsciousness*

The trial court instructed the jury on the defense of unconsciousness by giving CALJIC instructions Nos. 4.30 and 4.31, both requested by the prosecutor and defense counsel.

CALJIC No. 4.30 provides: "Where a person commits an act without being conscious thereof, such act is not criminal even though, if committed by a person who was conscious, it would be a crime. [¶] This

rule of law applies only to cases of the unconsciousness of persons of *sound mind,* such as somnambulists or persons suffering from the delirium of fever, epilepsy, a blow on the head or the involuntary taking of drugs or intoxicating liquor, and other cases in which there is no functioning of the conscious mind." (Italics added.)

CALJIC No. 4.31 (1972 revision) provides: "If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant acted as if he was conscious, you should find that he was conscious. [¶] However, if, notwithstanding the defendant's appearance of consciousness, the evidence raises a reasonable doubt whether he was in fact conscious, you should find that he was then unconscious."

A. *The contention that the trial court,* sua sponte, *should have given an instruction on the legal definition of unconsciousness.*

 It is defendant's contention that the trial court had an obligation, *sua sponte,* to give an instruction defining unconsciousness in a legal sense and that CALJIC No. 4.30 gives only a lay definition of unconsciousness. Defendant's assertion that the trial court's obligation was a *sua sponte* obligation is derived from the principle that " '[i]t is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' " (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].)

Defendant asserts that the legal defense of unconsciousness is that set forth in *People* v. *Newton* (1970) 8 Cal.App.3d 359, 376 [87 Cal.Rptr. 394]: " 'Unconsciousness,' . . . need not reach the physical dimensions commonly associated with the term (coma, inertia, incapability of locomotion or manual action, and so on); it can exist . . . where the subject physically acts in fact but is not, at the time, conscious of acting." (Fn. omitted.)

This contention of defendant is lacking in merit. CALJIC No. 4.30 accurately describes the concept of unconsciousness as it is set forth in the *Newton* case. It is true that CALJIC No. 4.30 does not refer to the limited idea that unconsciousness refers to persons in a coma or lacking capability of manual action. But the instruction makes clear that the

concept of unconsciousness covers the situation described in *Newton* in which the person involved "physically acts in fact but is not, at the time, conscious of acting." (*Id.,* at p. 376.) We consider that the phrase used in CALJIC No. 4.30 of unconsciousness existing "in which there is no functioning of the conscious mind" as adequately describing the definition of unconsciousness set forth in *Newton.*

Defendant relies upon *People* v. *Williams* (1971) 22 Cal.App.3d 34 [99 Cal.Rptr. 103], as holding that CALJIC No. 4.30 is deficient in its definition of unconsciousness. Defendant suggests that CALJIC No. 4.30 could be interpreted by the jury as excluding a person who acts in an outwardly apparently normal manner from in fact being unconscious. But we do not construe *Williams* as so holding. The *Williams* court directed its dissatisfaction with CALJIC No. 4.31 as being capable of misleading the jury under the circumstances presented in *Williams* of requiring a finding that a defendant was conscious if he in fact acted as if he were conscious.

The *Williams* court considered that CALJIC No. 4.31, as given in that case, was couched in language of a conclusive presumption of consciousness following from the fact that one acted in a conscious manner. The 1972 revision of CALJIC No. 4.31, which was given in the case at bench, changed the language slightly in an effort to meet the criticism stated in *Williams.* It is clear that a presumption arises that a person is presumed to be conscious when he acts as if he were conscious. (*People* v. *Hardy* (1948) 33 Cal.2d 52 [198 P.2d 865].) The first paragraph of the 1972 revision of CALJIC No. 4.31 is the same as the first paragraph of CALJIC No. 4.31 which was given in *Williams.* The presumption of consciousness is a rebuttable presumption that affects the burden of proof. (See Evid. Code, § 606.) The burden of overcoming the presumption is upon the defendant. The presumption places upon the defendant the burden of rebutting the presumed fact of consciousness by raising a reasonable doubt as to its existence. (Evid. Code, § 607.) The second paragraph of CALJIC No. 4.31, as revised in 1972, sets forth the method of operation of this presumption. It does so properly without using the term "*presumption.*" We find nothing confusing or contradictory in the instruction.*

---

*We are aware of the fact that, on July 27, 1978, the case of *People* v. *Cruz* (1978) *ante,* page 308 [147 Cal.Rptr. 740] was filed and takes a different view. However, we find nothing in *Cruz* which requires us to alter our opinion regarding the correctness and validity of CALJIC No. 4.31 (1972 revision).

■ CALJIC No. 4.31 (1972 revision) is subject to criticism, however, in its statement that, upon the evidence raising a reasonable doubt as to whether the defendant was in fact conscious, the jury *"should"* find that defendant was then unconscious. The use of the word "should" might well be understood by the jury as *not* requiring it to make a finding of unconsciousness under the circumstances of reasonable doubt. The instruction should be reworded to state that, upon the evidence raising a reasonable doubt whether defendant was in fact conscious, "you *must* find that he was then unconscious."

Defendant points to the fact that *Williams* criticized CALJIC No. 4.31 prior to its 1972 revision in the following language: "The sense of this instruction is completely incompatible with the view of all the expert witnesses that to an outward observer, even a trained physician, a person in a psychomotor seizure acts quite purposefully and normally; in effect, as if he were conscious. It could have, in fact, probably appeared to the jurors that the trial court was instructing them that, despite the opinions of the medical experts, unanimous under an assumption of the existence of a psychomotor seizure (it being only as to the existence of that premise that their views differed), the law directed that they find that defendant was conscious by reason of his mutually conceded conscious-like acts. CALJIC No. 4.31 requires the jury, as a rule of law, to find a fact and not just give consideration to a rebuttable presumption." (*Williams, supra,* 22 Cal.App.3d 34, 55-57; fn. omitted.)

This danger envisioned in *Williams* does not appear to us to exist under the 1972 revision of CALJIC No. 4.31, in which the last paragraph reads as follows: "However, if, notwithstanding the defendant's appearance of consciousness, the evidence raises a reasonable doubt whether he was in fact conscious, you should find that he was then unconscious."

B. *The contention that CALJIC No. 4.30 is erroneous in limiting the defense of unconsciousness to persons of sound mind.*

■ Defendant claims that the giving of CALJIC No. 4.30, which limits the defense of unconsciousness to persons of *sound* mind was prejudicially erroneous in the case at bench because the evidence supported a finding that defendant was subject to epileptic seizures which caused him to be of unsound mind and yet to act unconsciously. CALJIC No. 4.30, therefore, argues defendant, precluded the jury from finding that the defense of unconsciousness was a valid defense available to defendant. Defendant asserts that this error was highlighted because

defense counsel argued to the jury that defendant was not in his right mind at the time the offense was committed. It is defendant's position that the combination of the error in the instruction and defense counsel's argument to the jury resulted in the withdrawal of a crucial defense.

The defense of unconsciousness is derived from Penal Code section 26 which provides that all persons are capable of committing crimes except those falling in the seven listed categories. One category is set forth as "Five—Persons who committed the act charged without being conscious thereof." A separate category provided for in Penal Code section 26 is "Three—Lunatics and insane persons." In *People* v. *Hardy, supra,* 33 Cal.2d 52, 66, the court interpreted Penal Code section 26 by stating that category "Five" of that section " 'does not contemplate cases of unsound mind,—that is, cases of idiots, lunatics, and insane persons,—but upon the contrary, contemplates only cases of persons of sound mind' who suffer from some force that leaves their acts without volition." (See, also, *People* v. *Methever* (1901) 132 Cal. 326 [64 P. 481].)[1]

The condition of unsoundness of mind, if considered as a complete defense, in and of itself, comes within the category of subdivision Three of Penal Code section 26—"Lunatics and insane persons." Thus, Penal Code section 21 provides, in pertinent part, that "[a]ll persons are of sound mind who are neither idiots nor lunatics, nor affected with insanity."

The Penal Code requires that the defense of insanity be handled differently from that of unconsciousness. Unconsciousness as a defense is raised by the plea of not guilty. But a plea of not guilty by reason of insanity must be entered to raise the defense of insanity (Pen. Code, § 1016) and, if such a plea is entered, a defendant must first be tried on the plea of not guilty "and in such trial he [defendant] shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed." (Pen. Code, § 1026.)

In essence, defendant is asserting that unsoundness of mind, even though not amounting to insanity as a complete defense, may still constitute a complete defense by way of the defense of unconsciousness.

The evidence introduced by defendant, through nonexpert witnesses, did tend to show that defendant suffered unsoundness of mind caused by

---

[1]Overruled on other grounds, *People* v. *Gorshen* (1959) 51 Cal.2d 716, 731-734 [336 P.2d 492].

epilepsy. Thus, Maxine Marrs, defendant's mother-in-law, testified that, after a seizure "[i]t would generally take about a half hour or a little longer in order for him to come back into his *right mind.*" (Italics added.) Defendant's brother-in-law testified that, after a spell, defendant walked around and when the witness found him, he would "get . . . like a zombie . . . like he was in Disneyland."

CALJIC No. 4.30, in limiting the defense of unconsciousness to persons of sound mind, follows the construction of Penal Code section 26 as set forth in *Hardy, supra,* 33 Cal.2d 52, and *Methever, supra,* 132 Cal. 326. But the validity of *Hardy* and *Methever* has been eroded by subsequent decisions of our high court. In *People* v. *Baker* (1954) 42 Cal.2d 550 [268 P.2d 705], the court indicates that the terms " '[s]ound mind' and 'legal sanity' are not synonymous." (*Id.,* at p. 568.) The *Baker* court also notes that "[t]he distinction that these definitions draw between soundness of mind and legal sanity is impliedly recognized in section 26 of the Penal Code, which provides that lunatics, idiots, and insane persons are not capable of committing crimes. It is expressly provided in section 21 of the Penal Code that idiots and lunatics are not of sound mind, yet, if soundness of mind and legal sanity are synonymous, the express provisions of section 26 exempting idiots and lunatics from criminal responsibility would be superfluous because they would necessarily be included within the provision exempting the insane." (*Id.,* at pp. 568-569.)

That Penal Code section 26 should *not* be interpreted to preclude a defendant who is of unsound mind from also relying on the defense of unconsciousness is mandated by the following views set forth in *Baker*: "Although moronity and the mental condition caused by epileptic seizures, *unless they amount to unconsciousness,* are not included within the exempting provisions of section 26 of the Penal Code, nevertheless these conditions may indicate some lack of a 'healthy and robust mind' and do have bearing on the question of the capacity to premeditate and deliberate." (*Baker, supra,* 42 Cal.2d 569.) (Italics added.)

In *Williams,* a murder case, medical testimony was introduced to establish that the defendant suffered from psychomotor epilepsy. This expert testimony was to the effect that psychomotor epileptics have unsound minds. In *Williams,* as in the case at bench, the trial court gave CALJIC instructions Nos. 4.30 and 4.31. The *Williams* court criticized CALJIC No. 4.30 because of its confinement of cases of the unconsciousness of persons to those of unsound mind. The court stated: "In cases of

the instant type the indirect preclusion of the use of the rule [CALJIC No. 4.30] to persons of unsound mind should be eliminated. . . . However, it is easy for one to say that a defendant was conscious, rather than unconscious, when one is being told by the source of legal knowledge that even if he were unconscious, by reason of the fact that that state derives from unsoundness of mind, the excusatory rule of law would not apply." (*Williams, supra,* 22 Cal.App.3d 34, 54-55.)

*Williams* points out that a defendant may be at the same time (1) legally insane, (2) unconscious of his actions and (3) have unsoundness of mind which would produce diminished capacity for the requisite specific intents for the offense of murder charged against a defendant. *Williams* points out that "[l]egal insanity . . . means 'a . . . deranged condition of the mind which makes a person incapable of . . . understanding the nature and quality of his act, or . . . of . . . understanding that his act was wrong.' " (*Williams, supra,* 22 Cal.App.3d 34, 53.) *Williams* concluded that under this definition of legal insanity "the condition defendant was said to be in if he had been suffering a psychomotor epileptic seizure would have made him legally insane as well as unconscious of his actions and diminished in capacity for the requisite specific intents." (*Id.,* at p. 53.)

Defendant's appellate counsel asserts that defendant's trial counsel diverted the jury's attention from the defense of unconsciousness because of his argument that defendant's actions indicated that there was something mentally wrong with the defendant. Thus, defense counsel argued to the jury that defendant's reaction was the "reaction of somebody that is either goofy or somebody that is in a trance or somebody that had done something and didn't realize what he had done. Just standing there." Defense counsel also stated that defendant's actions "creates reasonable doubt as to whether or not the defendant was in his right mind at that time. We don't know."

At the request of the People, the trial court also gave CALJIC instruction No. 8.77 (1976 revision) dealing with diminished capacity.[2]

---

[2]CALJIC instruction No. 8.77 provides as follows:

"If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication, or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter.

"Thus, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he did, maturely and meaningfully,

We are unable to agree with defendant's appellate counsel that trial defense counsel's argument amounted to withdrawing from the case the crucial defense of unconsciousness. The evidence introduced by defendant which tended to establish unsoundness of mind made the defense of diminished capacity equally relevant with the defense of unconsciousness. Defense counsel's argument fairly set forth the ability of the jury to draw from the evidence inferences to establish the defense of unconsciousness or that of diminished capacity to reduce the offense of murder to a lesser offense.

Although it was error for the trial court to give CALJIC No. 4.30 because of the erroneous language in that instruction which *limits* the defense of unconsciousness to persons of *sound* mind, the question is presented as to whether the giving of that instruction, by itself, constitutes reversible error. Defendant's argument is predicated on the fact that the instruction took away defendant's defense of unconsciousness because the jury might well have found defendant to be lacking in soundness of mind and thus unable under the law to be accorded the defense of unconsciousness. This argument is unacceptable in the case at bench since, in spite of the instruction on diminished capacity, the jury found defendant to be guilty of first degree murder. This finding constitutes a rejection of the evidence that defendant had any substantially reduced mental capacity caused by mental illness, mental defect or any other cause, such as epilepsy.

In the case at bench defendant did not, like the defendant in *Williams,* produce any expert testimony as to the effect of epilepsy in creating any

---

premeditate, deliberate, and reflect upon the gravity of his contemplated act, or form an intent to kill, you cannot find him guilty of a willful, deliberate and premeditated murder of the first degree.

"Also, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he was able to form the mental states constituting either express or implied malice aforethought, you cannot find him guilty of murder of either the first or second degree.

"[If you have a reasonable doubt [1] whether he was able to form an intention unlawfully to kill a human being, or [2] whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death, or [3] whether he did act despite that awareness, you cannot find that he harbored express malice.]

"[Further, if you have a reasonable doubt [1] whether his acts were done for a base, anti-social purpose, or [2] whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death, or [3] whether he did act despite that awareness, you cannot find that he harbored implied malice.]

"Furthermore, if you find that as a result of mental illness, mental defect, or intoxication, his mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill at the time the alleged crime was committed, you cannot find him guilty of either murder or voluntary manslaughter."

unsoundness of mind or a state of unconsciousness. In the absence of such expert testimony, the jury was certainly free to reject the flimsy type of nonexpert testimony which pointed to a lack of soundness of mind. We are unable to conclude, as defendant would have us conclude on this appeal, that defendant's trial counsel, by requesting no additional instructions on the defense of unconsciousness, and by his method of argument to the jury, rendered his representation of defendant a constitutionally inadequate representation as described in *People* v. *Ibarra* (1963) 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487].

### IV

### *The Admissibility of Two Photographs In Color*

The trial court admitted in evidence one color photograph depicting the kitchen area of the Novack home with large puddles of blood on the floor, and one photograph showing blood stains splattered on the floor leading to another room with the victim's feet lying near the pools of blood.

■ The People assert that defendant did not object to the admission of those two photographs and, hence, cannot urge error on appeal. (Evid. Code, § 353, subd. (a).) The record reflects that defendant first objected to a photograph which the trial court excluded. The prosecutor then asked for the court's ruling on the two photographs in issue here. The court answered that the objection was being overruled. It is abundantly clear, therefore, that the prosecutor and the trial court assumed that defendant was objecting to the two photographs before us as well as to the photograph which was excluded. Defendant was given no opportunity to make his objections more explicit. There has thus been no waiver of the right to claim error on appeal by any failure to make an appropriate objection below. The prosecutor stated that these photographs were offered to "show the route taken by the victim after he was shot and the fact the victim was not armed." But defendant stipulated that the victim was not armed. Defendant's objection to the two photographs was based on undue prejudice. (Evid. Code, § 352.) We have examined these two exhibits which were made a part of the record on appeal.

■ Unquestionably, these two exhibits are unpleasant and unsightly. They should have been excluded as *irrelevant* evidence (Evid. Code, § 350), since they had no tendency in reason to prove or disprove any

disputed fact of consequence to the determination of the action (Evid. Code, § 210). The route which the victim took in the Novack home after being struck with a bullet from a shotgun served no purpose of proving any disputed issue in the case. There is *no* discretion vested in a court to admit irrelevant evidence. (Evid. Code, § 350.)

But even though irrelevant, these photographs were not of such a gruesome or repulsive nature as to inflame the passions of the jury and adversely affect the ability of the jury to calmly assess and evaluate the evidence introduced by defendant to establish his defense. The error in admitting this irrelevant evidence was therefore harmless.

V

*The Effect of the Jury's View of Photographs*
*Not Admitted into Evidence*

While the jury was deliberating, it was discovered that four photographs that were introduced at the preliminary hearing but not introduced at the trial, were inadvertently sent into the jury room along with the exhibits received into evidence. The trial court stated for the record that the jury did observe all or some of the four photographs. The court further stated: "At least two of the photographs are similar to one submitted to the Court, wherein the Court indicated that it would sustain an objection, and it was not offered. The other two were not submitted, or they are not probative."

The four photographs were removed after the discovery that they had been inadvertently placed in the jury room. It was estimated that these photographs remained in the jury room for approximately five minutes. Defense counsel's motion that the jurors be questioned in order to determine how many of the jurors saw the photographs was denied. Defendant's motion for a mistrial, based upon the jury's observation of these photographs which defendant contended were inflammatory and prejudicial, was also denied.

The record indicates that two of the photographs depicted the wound to the victim and two of the photographs were pictures of the victim in the nude that did not depict any wound. ■ It is the contention of defendant that the error involved in the jury's observation of these photographs not admitted into evidence and the refusal to permit

questioning of the jurors to determine how many of the jurors observed the photographs constituted prejudicial error.

Even though the jury's observation of these photographs was not intentional, the fact that the photographs were actually observed by jurors falls under the category of juror misconduct. In *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050], the court stated: "It is well settled that a presumption of prejudice arises from any juror misconduct. In an early case we said: 'For when misconduct of jurors is shown, it is presumed to be injurious to defendant, unless the contrary appears.' " *Honeycutt* points out various instances of juror misconduct that have required a reversal of a conviction because of the presumption of prejudice and the absence of evidence to rebut this presumption. These instances included the presence of an alternate juror during deliberations, even though no words were spoken by such juror (*People* v. *Britton* (1935) 4 Cal.2d 622 [52 P.2d 217, 102 A.L.R. 1065]), and the reading by jurors of newspaper accounts of trial proceedings and communications by the jurors and bailiffs of an unauthorized nature (*People* v. *Wong Loung* (1911) 159 Cal. 520 [114 P. 829]). The juror misconduct in *Honeycutt* involved the foreman's obtaining from an outside attorney information regarding the law.

The question presented here is whether the presumption of prejudice from the juror misconduct of observing photographs not admitted into evidence was rebutted. "[T]he presumption may be rebutted by proof that no prejudice actually resulted." (*Honeycutt, supra,* 20 Cal.3d 150, 156.) It is defendant's contention that the trial court's ruling refusing to permit questioning of the jurors regarding their observations of these photographs foreclosed all possibility of any rebuttal of the presumption of prejudice.

Defendant relies upon *People* v. *Lambright* (1964) 61 Cal.2d 482 [39 Cal.Rptr. 209, 393 P.2d 409], in which the jurors had read newspaper accounts of statements made by the defendant which the trial court had ruled as inadmissible hearsay. The court denied defendant's request to question the jury to determine whether any of the jurors had read the newspaper reports. In *Lambright,* it appears that the trial court had initially advised the jurors that they could read newspaper articles and listen to radio news broadcasts of matters that would be pertinent to the trial, but that they should not consider such matters in evaluating the evidence presented in the case. The *Lambright* court concluded that "[i]n the present case, however, the court's original error of allowing the jury to

receive extrajudicial accounts of the trial was compounded by the refusal to poll the jury. Since the trial court expressly authorized the jury to read newspaper accounts of the trial, it is reasonably probable that some of the jurors did so and that their misconduct, even though innocent, affected the result. Accordingly, the error was prejudicial." (*Lambright, supra,* 61 Cal.2d 482, 487; fn. omitted.)

The People assert that *Lambright* is not controlling in the case at bench on the theory that even though the record demonstrates that the jurors saw the photographs which had not been admitted into evidence, the trial court could correctly conclude that they were not of a nature to affect the result and, hence, the presumption of prejudice should be deemed to be rebutted.

The People rely upon *People* v. *Reyes* (1974) 12 Cal.3d 486 [116 Cal.Rptr. 217, 526 P.2d 225], as supporting their contention that the presumption of prejudice was rebutted in the case at bench by the nature of the photographs which were innocently but improperly seen by the jury.

In *Reyes,* as in the case at bench, items excluded from evidence were left by mistake in the jury room during jury deliberations. The items in *Reyes* consisted of clothing of the victim. In *Reyes,* the defendant objected to the introduction of the evidence on the ground that it was inflammatory and prejudicial. The court overruled the objection, but the prosecutor decided that he would introduce only one item of the victim's clothing—the victim's trousers. Other items of the victim's clothing were inadvertently sent to the jury room. The *Reyes* court held that the presumption of prejudice was adequately rebutted. The main basis of the *Reyes* decision was predicated on the fact that the trial court was never convinced that the clothing was inflammatory and prejudicial. Having originally ruled that the evidence was admissible, the failure of the prosecution to introduce the other items of the victim's clothing and the erroneous observance of these items by the jury were deemed nonprejudicial.

In the case at bench, we have the situation in which the trial court stated for the record that two of the photographs seen by the jury which were not admitted into evidence, were exhibits which the court had previously indicated would not be admitted in light of the defendant's objection to such exhibits. However, the trial court subsequently denied defendant's motion for a new trial.

It is to be noted that the defendant's request for questioning of the jury in the case at bench was designed solely to ascertain how many of the jurors had actually observed the four photographs. Defendant did not seek to question the jurors as to whether they had been influenced by the photographs which they had seen. As pointed out in *Reyes,* an examination of the jurors individually to determine if the presence of the excluded evidence in the jury room affected the jury's verdict is explicitly proscribed by Evidence Code section 1150, subdivision (a), which provides that in a proceeding to test the validity of a verdict because of statements or conduct on the part of jurors "[n]o evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

Although the trial court made the statement that the court would have sustained an objection to "at least two of the photographs" that erroneously found their way into the jury room, this does not determine that the presumption of prejudice was not rebutted. We have noted previously that the trial court denied defendant's motion for a new trial. In addition, we have examined the photographs involved. We conclude that these photographs were not of a nature to have had any effect upon the jury's verdict and that they constituted a rebuttal of the presumption of prejudice which arises from juror misconduct as set forth by the *Honeycutt* court.

Although defendant's trial was not an errorless trial, an examination of the entire record leads to the conclusion that it is not reasonably probable that the jury would have reached a result more favorable to defendant had the errors discussed herein not occurred. (See *People v. Duran* (1976) 16 Cal.3d 282, 286 [127 Cal.Rptr. 618, 545 P.2d 1322]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is affirmed.

Files, P. J., and Goertzen, J.,* concurred.

A petition for a rehearing was denied August 31, 1978, and appellant's petition for a hearing by the Supreme Court was denied October 12, 1978.

---

*Assigned by the Chairperson of the Judicial Council.