[No. B080766. Second Dist., Div. Seven. July 20, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT ANTHONY VON VILLAS, Defendant and Appellant.

COUNSEL

Russell Iungerich, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Marc E. Turchin and Paul C. Ament, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LILLIE, P. J.—In 1988, Robert Anthony Von Villas and codefendant Richard Ford were convicted, following a joint trial before separate juries, of conspiracy to commit murder (Pen. Code, §§ 182, 187) and the first degree murder of Thomas Weed. (Pen. Code, § 187.) Each jury found the special circumstance allegation that the murder was committed for financial gain to be true. (Pen. Code, § 190.2, subd. (a)(1).) Von Villas was sentenced to life in prison without possibility of parole on the murder with special circumstances count, and 25 years to life on the conspiracy count. The sentence on the conspiracy count was stayed pursuant to Penal Code section 654.[1]

Von Villas and Ford appealed from their judgments; this court affirmed the judgment as to Ford and vacated the judgment as to Von Villas, remanding the cause to the trial court for a full and fair hearing on Von Villas's allegations of juror misconduct.[2] Following said hearing, and on June 17, 1993, the trial court determined there was no juror misconduct and denied Von Villas's motion for a new trial.

On July 26, 1993, Von Villas filed his notice of appeal from the "judgment/order of June 17, 1993" denying his motion for a new trial on the grounds of jury misconduct.

On July 28, 1993, the trial court issued a nunc pro tunc order that the minute order of June 17, 1993, be corrected as of June 17, 1993, reimposing the original sentence.[3]

---

[1]The sentence of life in prison without possibility of parole was ordered to run consecutive to the term of 35 years to life imposed upon Von Villas in another case.

[2]*People* v. *Von Villas* (1992) 11 Cal.App.4th 175, 261 [15 Cal.Rptr.2d 112].

[3]As the judgment was entered nunc pro tunc as of June 17, 1993, the notice of appeal from the judgment was valid as of the date it was filed.

EVIDENCE AT HEARING REGARDING ALLEGED JUROR MISCONDUCT

At the hearing following remand by this court, Betty Cornick testified that in 1989 she was a juror on this case; she recalled there were two juries hearing the case; during the defense part of the case against Von Villas, her jury was excused; sometime thereafter, she learned that the other jury had "ended their trial" and that codefendant Ford had been convicted; she probably learned this information the next day; there was a picture in the newspaper and writing under the picture to the effect, "Ford Convicted" or "something like that"; she did not read the article and did not discuss the fact that Ford had been convicted with any of the other jurors; she did not recall any discussions going on in the jury room about the fact that Ford had been convicted; she recalled that the judge had instructed her not to read any newspapers, but she glanced at this one anyway.

Some weeks after she concluded jury service, she had a phone call from someone but did not get the person's name; she discussed with that person that she had received information from a newspaper article; she told the caller that she would not sign an affidavit and she did not want to be involved anymore. When she spoke to the person on the telephone she did not say, "One or more of the jurors had read about that crime and learned about the conviction from an article in the 'Los Angeles Times' "; she told the caller that, "One of the jurors, Ron Rudy, advised them that they were not supposed to read about the case in the newspaper." She did not say she heard on the radio and saw on television that codefendant Ford was convicted of murder by his jury; she did not tell the caller, "The next day all of the jurors knew about it"; she did not tell him that Ford's conviction was discussed in the jury room.

Cornick testified she did not read the article associated with the picture and headline because she "would have got killed." The newspaper was delivered to her house; she brought the paper in, sat down on the couch with her coffee and opened the paper "and it was there." She then closed the paper, drank her coffee and got ready to go to court.[4]

David Boykoff testified he is a private investigator and was working for Von Villas. He interviewed Juror Cornick by telephone and she said she had known about Ford's conviction during the guilt phase of the Von Villas trial, that she read it in the newspaper and heard it on television. Boykoff's memory was unclear about whether any of the other jurors knew about Ford's conviction. He participated with Donald Feinberg, one of Von Villas's attorneys, in drawing up an affidavit for Cornick's signature and told

---

[4]Von Villas had previously alleged juror misconduct, as some members allegedly learned he had been involved in a jewelry robbery; Von Villas does not so contend on this appeal.

Feinberg exactly what Cornick told him. The affidavit refreshed Boykoff's recollection, and he testified that Cornick told him that other jurors had discussed Ford's conviction in the jury room.

The court took judicial notice of that portion of the trial transcript reflecting the court's admonition to the jury the day of Ford's verdict. The court warned: "I want to caution you as I have told you repeatedly to avoid any publicity or anything on this case. [¶] As I'm sure you are aware, there's some cameras. They are not turned on at this point, but I anticipate there will be some publicity on this case. [¶] And I'm going to caution you very strongly. I would ask that you not watch any newscasts on the television tonight. And if you must read a newspaper, if you have a [housemate] or someone that could sensor [*sic*] the paper for you and not read any publicity at all on this case. [¶] And you might be cautious also what you happen to listen to on your car radio going home and coming to court tomorrow. [¶] So this is very important and please obey that admonition. These are two different trials and they are totally separate things so please be very cautious as to what you see or hear."

The court also took judicial notice of the query to the jury the next day wherein the court stated: "Ladies and gentlemen of the jury, after my admonition yesterday, I'd like to make a general inquiry of you if any of you inadvertently or otherwise did see or hear any publicity about this case, specifically, on Mr. Ford. [¶] If you did, would you give me a showing of hands. [¶] I see no showing of hands. [¶] All right. I will ask you to continue to follow my admonition."

At the conclusion of the hearing testimony, defense counsel argued that Cornick openly admitted that she brought the newspaper into her house, opened it up and there was the picture of Ford right on the front page with the statement he was convicted. She violated the court order by looking at the newspaper and she compounded the problem by coming into the court the same day and failing to notify the court what she had seen in response to the court's specific inquiry whether any of the jurors had inadvertently or otherwise seen or heard any publicity about this case, specifically, as to Mr. Ford. Counsel argued that it only took one juror to receive improper information to have an unfair trial.

In ruling on the motion, the court stated in pertinent part: "[Cornick] did testify that she had opened the paper after being admonished by the court the previous evening to avoid newspapers, radio and TV. And she saw the caption 'Ford convicted.' [¶] And she was asked if she read the article. And her response was, 'No, because I would have been killed.' . . . The point of

that is it certainly stresses that she recognized the seriousness of my admonition and that it was total inadvertence and she did not expect to see Ford's picture or this article on the front page. [¶] Certainly would not surprise the rest of us or anyone connected in this kind of work, but to a person like Betty Cornick, I think it was an innocent act. And she immediately recognized what she did and put it to rest. [¶] Her affidavit that was unsigned that the District Court of Appeal seemed to place great weight on that, she indicated in that that all the jurors were discussing it in the jury deliberation room. [¶] I heard absolutely no testimony to that here, and I do not find that was a fact. [¶] And she denies most of what was in that affidavit. Certainly, if everything that had occurred in the affidavit had been proven here there might be a different light, but that was not her testimony. [¶] The court indicated I should judge the credibility of the jurors. And I judged her credibility and I believe what she said here, that to the best of her remembrance that that was what occurred. . . . [¶] So as to Betty Cornick, I do not find that she committed juror misconduct."

DISCUSSION

■ Appellant's contention that prejudicial juror misconduct occurred requiring reversal and a new trial is without merit. ■ While it is well settled that it is misconduct for a juror to read newspaper accounts of a case on which he or she is sitting, and that receiving impressions from sources other than evidence received at trial raises a presumption of prejudice, this presumption of prejudice may be rebutted. (*People* v. *Holloway* (1990) 50 Cal.3d 1098, 1108 [269 Cal.Rptr. 530, 790 P.2d 1327].) "This presumption of prejudice ' "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party [resulting from the misconduct]. . . ." ' [Citations.]" (*In re Hitchings* (1993) 6 Cal.4th 97, 119 [24 Cal.Rptr.2d 74, 860 P.2d 466].) ■ Our Supreme Court in *In re Carpenter* (1995) 9 Cal.4th 634, 653 [38 Cal.Rptr.2d 665, 889 P.2d 985], recently summarized that ". . . when misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test."

The court explained further that the "first of these tests is analogous to the general standard for harmless error analysis under California law. Under this standard, a finding of 'inherent' likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment. Application of this 'inherent prejudice' test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information. [¶] But a finding that the information was 'harmless' by appellate standards, and thus not 'inherently' biasing, does not end the inquiry. Ultimately, the test for determining whether juror misconduct likely resulted in actual bias is 'different from, and indeed less tolerant than,' normal harmless error analysis, for if it appears substantially likely that a juror is actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict. [Citation.] A biased adjudicator is one of the few 'structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless error' standards.' [Citations.] Thus, even if the extraneous information was not so prejudicial, in and of itself, as to cause 'inherent' bias under the first test, the totality of the circumstances surrounding the misconduct must still be examined to determine objectively whether a substantial likelihood of actual bias nonetheless arose. Under this second, or 'circumstantial,' test, the trial record is not a dispositive consideration, but neither is it irrelevant. All pertinent portions of the entire record, including the trial record, must be considered. 'The presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, *upon examining the entire record*, that there is no substantial likelihood that the complaining party suffered actual harm.' [Citation.]" (9 Cal.4th at pp. 653-654, italics in original.) The court in *Carpenter* emphasized "that before a unanimous verdict is set aside, the likelihood of bias under either test must be *substantial*. . . . [¶] If the court concludes it is substantially likely the outside information affected the verdict, or that the juror was *actually biased,* the verdict must be set aside. If not, 'society's interest in the administration of criminal justice' [citation] must be vindicated, and the judgment preserved. It is not enough that the juror was 'placed in a potentially compromising situation,' for then 'few trials would be constitutionally acceptable.' [Citations.]" (*Id.* at pp. 654-655, italics in original.)

While we agree that Cornick committed misconduct by receiving information from an extraneous source, which raised a presumption of prejudice, we conclude that the presumption has been rebutted and there does not appear a substantial likelihood of juror bias. The extraneous information judged objectively was not inherently and substantially likely to have influenced the juror. The information received from glancing at a

headline was that codefendant Ford had been convicted by another jury. Juror Cornick testified, and the trial court believed, that she had not read the accompanying newspaper article. This information was not about Von Villas but was about codefendant Ford. The case against Ford was different from the case against Von Villas and the court had instructed the jury that they were two different and separate trials. Additionally, in the context of this record, where overwhelming evidence had been amassed against Von Villas, the extraneous material was not inherently and substantially likely to have influenced the juror. (See *People* v. *Von Villas, supra*, 11 Cal.App.4th 175, 251.) Under the second test, looking to the nature of the misconduct and the surrounding circumstances we determine that it was not substantially likely that Juror Cornick was actually biased against Von Villas. Cornick testified that the newspaper had been delivered to her house, that she opened it up, "it was there," and then she closed the paper. Cornick did not read the article because if she had "she would have been killed." While this testimony reveals that Cornick disobeyed the court instruction that she not look at any newspapers, it also indicates her behavior was inadvertent and, as the trial court observed, that she recognized the seriousness of the court's admonition that she must decide the case only on the evidence received at trial. The trial court judged Cornick's credibility and believed her testimony.

We conclude that it is not substantially likely the extraneous information affected the verdict or that juror Cornick was actually biased against Von Villas and, therefore, preserve the judgment.

## DISPOSITION

The judgment is affirmed.

Johnson, J., concurred.

## WOODS (Fred), J., Dissenting.—

## INTRODUCTION

For the second time we consider whether juror misconduct requires overturning appellant's murder and conspiracy to murder convictions.

The first time (*People* v. *Von Villas* (1992) 11 Cal.App.4th 175 [15 Cal.Rptr.2d 112]), this court[1] observed that the trial court believed juror misconduct had occurred (*id.* at p. 257) and the prosecutor had failed "to rebut the presumption of prejudice." (*Ibid.*) Nevertheless, the first time, this court did not overturn the Von Villas judgment. Instead it merely vacated that judgment with directions to the trial court to conduct another new trial hearing and with directions *how* to conduct it. In doing so this court stated: "By this we do not mean to opine that juror misconduct requiring a new trial for Von Villas did not occur. . . . [¶] . . . [¶] If, after the hearing, the trial judge concludes that juror misconduct actually occurred, and Von Villas was prejudiced thereby, he must be afforded a new trial." (*Id.* at pp. 259-260.)

As directed, the trial court conducted a second new trial hearing. Again, appellant proved juror misconduct and again the prosecution failed to rebut the presumption of prejudice. The trial court, again, denied the motion for new trial.

To explain why I believe a new trial is required it is necessary to do the following: provide a trial summary illuminating the connection between Von Villas and Ford; describe the subject juror misconduct, its significance and its effects; consider the standard of review for juror misconduct, its history, evolution, and present status; and outline my view there was a "structural defect" in the Von Villas trial.

### THE FORD-VON VILLAS TRIAL: A SUMMARY

On February 23, 1983, Thomas Weed disappeared. Although his body was never found, circumstances indicated he had been murdered. When his apartment manager entered his apartment a few days after his disappearance, the apartment was hot, the heat was still on, bread and melted butter were on a table, and all Mr. Weed's clothes and toiletries were in the apartment.

The police soon began a search for Mr. Weed. On March 23, 1983, they recovered his car at the Los Angeles Airport where it had been parked since February 23 or 24. In April and May they recovered forged credit card invoices from his account.

Mr. Weed's sister found a note in her brother's apartment, in his hand-writing. It said, "Jan threatened to kill me today."

"Jan" was Janie Ogilvie whom Thomas Weed had married about 15 months earlier. The marriage had followed their business partnership in

---

[1]Superior Court Judge Paul Flynn, sitting as a temporary judge, authored the majority opinion. Justice Johnson concurred. I dissented from the Von Villas disposition. (*People* v. *Von Villas, supra,* 11 Cal.App.4th at p. 261 et seq.)

Ford-Kennedy Medical Lab, a successful food allergy testing business. Ms. Ogilvie operated the business, Mr. Weed did the paperwork. Almost immediately after they married, problems occurred. They separated three months later, in January 1982. Thereafter, Ms. Ogilvie and Mr. Weed had repeated altercations at work. She claimed he was stealing from her and each filed charges against the other with the Los Angeles Police Department (LAPD).

Soon the police investigation focused upon Janie Ogilvie who, the police believed, had hired two LAPD detectives, Robert Von Villas and Richard Ford, to murder her husband.

On February 15, 1984, Janie Ogilvie, Robert Von Villas, and Richard Ford were indicted for conspiring to murder and for murdering Thomas Weed. They demanded and received a postindictment preliminary hearing.

Ms. Ogilvie agreed to cooperate with the prosecution and pursuant to a plea bargain, pleaded guilty to second degree murder. A friend of hers, Joyce Reynolds, who had encouraged Ms. Ogilvie to contact her friend, police detective Robert Von Villas, and have him kill Thomas Weed—also entered into a plea bargain. Ms. Reynolds pleaded guilty to solicitation of murder.

Following the postindictment preliminary hearing, Von Villas and Ford were charged with conspiring to murder and murdering Thomas Weed. Alleged as coconspirators were Janie Ogilvie, Joyce Reynolds, and Ms. Reynolds's daughter, Julie Rabold.

The trial court denied a motion to sever the trials of Von Villas and Ford and instead ordered a joint trial with separate juries.

Trial began July 5, 1988. Almost all the prosecution's case was heard by *both* juries.

Julie Rabold testified she began work at Ford-Kennedy Medical Lab in the summer of 1982 and soon became a close friend of Ms. Ogilvie. Julie's mother, Joyce Reynolds, frequently visited the lab and also became friends with Ms. Ogilvie. By the fall of 1982, after Ms. Ogilvie and Mr. Weed had begun divorce proceedings, Ms. Ogilvie often discussed her marital problems. Julie Rabold told Ms. Ogilvie she should have Mr. Weed killed and that she had friends in LAPD's Devonshire Division who could do it. In December 1982, while at lunch with other employees and Ms. Ogilvie, Julie Rabold again told Ms. Ogilvie "you ought to just get a hit man and have him taken care of" and that she knew people who could make someone disappear. Julie had known Von Villas for 13 years, since she was a little girl. He was a father figure to her. She did not know Ford.

Joyce Reynolds had also known Von Villas for 13 years. They were like brother and sister. In 1982 Von Villas told her he was available for murder jobs. In January 1983 Joyce Reynolds, on several occasions, suggested that Ms. Ogilvie hire someone to kill Mr. Weed and said she had a friend, "Bob," who could help. Joyce Reynolds gave Von Villas Ms. Ogilvie's telephone number.

In March 1983 Von Villas told Joyce Reynolds Tom Weed was dead.

Joyce Reynolds did not know Ford.

Ms. Ogilvie testified her first in-person contacts with Von Villas and Ford occurred in January 1983. Her first version was they identified themselves as Vic (Von Villas) and Charlie (Ford) and claimed to be Las Vegas gambling debt collectors looking for Thomas Weed. According to a later version, "Vic" and "Charlie," two police officers assigned to Devonshire Division, came to her home, said "we have a mutual friend [sic], Joyce and Julie" and said they could help her with her problem by taking care of the guy. The price was $7,500 to $30,000. Ms. Ogilvie testified Von Villas wore a wig and makeup. Ford's hair did not quite fit and his skin was darker than in court. The meeting lasted 20 to 30 minutes. Ms. Ogilvie told them she'd have to think about it.

A professional makeup artist testified to providing wigs and makeup to Von Villas and Ford.

Near the end of January Ms. Ogilvie told Joyce Reynolds she wanted her friends to take care of Mr. Weed. Soon thereafter, Joyce Reynolds told Ms. Ogilvie "Bob is going to call you. He wants to be known as Mr. Ory." The next night, "Mr. Ory" (Von Villas) called. In the ensuing days, the details were agreed to. The price was $20,000, to be paid in advance cash installments. "Mr. Ory" would be working with "Dickie" (*Richard* Ford). Ms. Ogilvie provided "Mr. Ory" a photo of Thomas Weed and a description of his car.

Ms. Ogilvie made two installment payments to Von Villas, $7,500 and $5,000. On February 23, 1983, she and Thomas Weed attended a city attorney hearing concerning one of their altercations. That evening, when "Mr. Ory" telephoned, she screamed, "Do it, do it."

Two days later, February 25, 1983, "Mr. Ory" called Ms. Ogilvie and said she owed him the final $7,500—indicating the job had been completed.

The police recovered a paper from Von Villas's car with Jan Ogilvie's name and telephone number. It was in Von Villas's handwriting.

On July 15, 1983, while searching the Von Villas residence, police recovered a note in Mrs. Von Villas's possession. It was in her handwriting and said, "Call Mr. Ory. Mr. Ory close friend in jail."

A Michael Ory testified he and Von Villas had been high school friends in 1961 but had had no contact for over 10 years. He didn't know Ms. Ogilvie or Ms. Reynolds and was not in jail in July 1983.

Police searched the Ford residence on December 20, 1983, and found a 1983 calendar with the date February 23 blacked out. Presented to the Ford jury only was evidence that a shotgun and ammunition were found in Ford's residence and two boxes of shotgun shells were found behind a movable wall partition.

During another search of Ford's residence police seized makeup, a hairpiece, and makeup utensils.

In 1982 and 1983 Ford and Von Villas were detectives assigned to the Devonshire Division. They also had an automobile repair business.

In December 1983, when Mrs. Ford visited her husband in jail, the police attempted to surreptitiously record their conversation. Due to technical difficulties only a fragment was recorded. This fragment was presented only to the Ford jury: "They're trying to see where the money went to.

"Good, good. There's no connection to me there. There is nothing there that connects me.

"There's no body.

"The only thing that worries me is the gas . . . [Mrs. Ford: 'What?'] The Shell credit card. [Mrs. Ford: (Unintelligible) 'Why? That bother you?'] Yeah. I don't know if I got gas . . . . Don't remember.

"They're fishing. They got the idea, but they gotta, they don't have it, I don't think. We'll see.

"He's just gone. He's gone. They're trying to find out where he's at.

"We'll see. Game's not over yet. What worries me is the shotgun. The shells."

Neither Ford nor Von Villas testified. Both called numerous witnesses attacking the credibility of Ms. Ogilvie.

Von Villas also presented evidence to explain his large cash bank deposits. A jeweler testified to purchasing diamonds from Von Villas on three occasions and paying him in cash.

Ford presented evidence to innocently explain his possession of wigs and makeup and to explain the calendar with February 23 blacked out.

The Ford trial ended first. On October 11, 1988, when the Ford jury indicated they had verdicts, Von Villas was presenting defense evidence to his jury. The trial court, before receiving the Ford verdicts, took careful measures to ensure that the Von Villas jurors would not learn of those verdicts. The trial court admonished them: "I want to caution you as I have told you repeatedly to avoid any publicity or anything on this case." She told them she anticipated publicity in connection with the Ford verdicts and said "I'm going to caution you very strongly. I would ask that you not watch any newscasts on the television tonight. *And if you must read a newspaper, if you have a housemaid or someone that could [c]ensor the paper for you and not read any publicity at all on this case.*

"· · · · · · · · · · · · · · · · · · · · · · · ·

"So this is very important and please obey that admonition. These are two different trials and they are totally separate things. *So please be very cautio[us] as to what you see or hear.*" (Italics added.)

The trial court then excused the Von Villas jury. The Ford jury was returned to the courtroom where the trial court received their guilty verdicts.

The next morning, upon reconvening the Von Villas jury, the trial court stated: "Ladies and gentlemen of the jury, after my admonition yesterday, I'd like to make a general inquiry of you *if any of you inadvertently or otherwise* did see or hear any publicity about this case, specifically, on Mr. Ford?

"If you did, would you give me a showing of hands.

"I see no showing of hands." (Italics added.)

Thus assured, the Von Villas trial resumed. It ended about two weeks later when, on November 3, 1988, the jury returned their guilty verdicts.[2]

### The Juror Misconduct, Its Significance and Effects

Five years after the Von Villas-Ford trial, the trial court conducted its second new trial hearing. At that hearing, in June 1993, five witnesses

---

[2]Both Ford and Von Villas had penalty trials but they are not here in issue.

testified, a Von Villas investigator, David Boykoff, a Von Villas trial attorney, Donald Feinberg, and three Von Villas trial jurors, Kathryn Ann Brown, Margaret Kitchen, and Betty Cornick.

The testimony concerned two juror misconduct incidents, one involving Jurors Brown, Kitchen, and Cornick, the other, only Juror Cornick.

1. *The first incident: Juror Kitchen's statement about the Schaffer & Sons Jewelry Store robbery.*

Before the instant trial began in July 1988, Ford and Von Villas had been tried for, and convicted of, robbing a jewelry store, Schaffer & Sons. That trial and the conviction of Ford and Von Villas was reported in the Los Angeles Times. (See *People* v. *Von Villas, supra*, 11 Cal.App.4th 175, 251-253.)

At the instant trial, no evidence was admitted of the Schaffer & Sons Jewelry Store robbery or of Ford and Von Villas having been convicted of that robbery. But there was testimony that reminded a juror, Ms. Kitchen, not only of that jewelry store robbery but of the involvement of Von Villas.

This is what happened. To offset prosecution evidence that after the Ogilvie cash installment payments Von Villas made large cash deposits to one of his accounts, Von Villas called two witnesses. They testified on October 12, 1988, the day after the Ford verdicts. Mr. William Justice testified he was a retail jeweler and on three occasions in December 1982, bought diamonds and other precious stones from Von Villas, paying him in cash. (*People* v. *Von Villas, supra*, 11 Cal.App.4th at p. 209.) Sheri Tama, a bank officer, testified that on December 13, 1982, she cashed a check for Von Villas and gave him $5,100 in cash.

The unusualness of a police officer, Von Villas, possessing a large number of diamonds and making large cash deposits struck Juror Brown. During a recess following the Justice-Tama testimony, Juror Brown asked Juror Kitchen "Where did the money come from?" A third juror, Betty Cornick, was present and heard the discussion.

At the June 1993 new trial hearing, all three jurors were asked about this discussion.

Ms. Cornick testified the three of them, she and Jurors Brown and Kitchen, were on a lunch break when Juror Kitchen said, "Did you hear that our guy might have been in a jewelry robbery?" Ms. Cornick did not know when, during the trial, the discussion occurred.

Ms. Kitchen first testified she didn't remember any such discussion. Then she did remember that after the large-cash-deposit testimony, Ms. Brown asked her, "Where did the money come from?" She answered, "Maybe it came from the jewelry store robbery." Ms. Kitchen did not know when this discussion occurred or even whether it occurred during the guilt or penalty phase.

Ms. Brown, like Ms. Cornick, remembered the discussion occurred during a recess "shortly after the testimony given in regards to money that Mr. Von Villas had deposited in his bank account." Ms. Kitchen told her the money came from the sale of diamonds and the diamonds "had been gotten at a robbery at a jewelry store at the Sherman Oaks Galleria." Later, after trying to remember *when* the discussion occurred, Ms. Brown recalled it occurred during the week she had started her evening paralegal training, during the week of October 15, 1988.[3]

2. *The second incident: Juror Cornick reads The Los Angeles Times and learns of Ford's conviction.*

Ms. Cornick testified she remembered the judge had "always" told the jurors "not to look at the papers and not to read anything."

But on the morning of October 12, 1988—just after the judge's special caution the day before, quoted *ante*, at page 1438 she stepped onto her porch, picked up her Los Angeles Times, "brought the paper in, sat down on the couch with [her] coffee and opened the paper."

The paper,[4] of course, had a story about the Ford guilty verdicts. The story began on page one of the first section. No photograph was included on that page. The story caption read: *Former L.A. Police Detective Convicted As Killer For Hire.* The story was continued on the last page of the first section. A photograph of Ford appeared on that page. The caption on that page read: *Killer. Jury Convicts Officer.*

---

[3]The trial court concluded Ms. Kitchen's comment was not misconduct because Ms. Kitchen, whom the trial court believed, testified she made the comment either in the jury box or during deliberations, in the jury room. If made in either place, the comment would not have violated the trial court's admonition "not to discuss the case"—the trial court stated—because the admonition applied only to a "recess or adjournment." Additionally, the trial court disregarded Ms. Kitchen's comment because, according to the trial court, Ms. Kitchen "was emphatic that it did occur at the *penalty* phase." The trial court was mistaken. If Ms. Kitchen was emphatic about anything, it was that she had no idea when she had made the comment. No substantial evidence supports the trial court's "findings" or legal conclusions.

[4]One edition, on October 12, 1988, covered the story in the first section on page 5. But Ms. Cornick received the Valley Edition, a copy of which was produced by the trial court and included in the record.

Ms. Cornick testified that when she "opened the paper" she saw, under Mr. Ford's photograph, " 'Ford Convicted.' Something like that." When asked if she "read the article associated with that picture and that headline" she answered "No, no, because I would have got killed, no."

Only a short time later that same morning, when the judge asked her (and the other jurors) if she had "inadvertently or otherwise . . . see[n] . . . any publicity about this case, specifically, on Mr. Ford?"—Ms. Cornick answered (by *not* raising her hand) "no."

### 3. *Significance and effects of Juror Kitchen's statement.*

"It is serious misconduct for jurors to procure any kind of new evidence by their own efforts." (6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) § 3012, p. 3709.) Juror Kitchen, by her own efforts, procured "new evidence": that Von Villas had robbed a jewelry store and stolen diamonds and other jewels. She shared this evidence with two juror friends, Jurors Brown and Cornick. They did not discuss this evidence with other jurors. It was their secret.

This secret new evidence was inherently prejudicial. It compromised, if not eliminated, the presumption of innocence by portraying the defendant as one who commits crimes for money. Such a portrayal corroborated key prosecution witnesses Janie Ogilvie, Joyce Reynolds, and Julie Rabold.

Because it was secret, the trial court had no occasion to admonish these jurors to disregard this "evidence." Appellant was not confronted by it. Defense counsel could not cross-examine it.

Appellant's decision not to testify might have been different had he known three jurors were already aware of his robbery conviction. Defense counsel's defense presentation and jury argument would have been different.

Even more immeasurable than these consequences were the effects on the three jurors themselves. Instead of a jury of 12 deliberating the credibility of much impeached Ms. Ogilvie and the presumed innocence of a police officer defendant, there were 2 juries: one which didn't know the defendant was a jewelry store robber, the other, which did.

### 4. *Significance and effects of Juror Cornick's misconduct.*

Juror Cornick committed two intentional acts of misconduct.

On Tuesday afternoon (October 11, 1988) she was admonished by the trial court *not* to read the next day's newspaper—to have someone censor it, if

possible—and warned that it would contain prohibited information about codefendant Ford. The judge's parting words were: "So please be very cautio[us] as to what you see or hear."

The next morning, Wednesday, Juror Cornick stepped onto her porch, picked up her home-delivered Los Angeles Times, brought it inside, "sat down on the couch with [her] coffee and *opened* the paper." This much she testified to.

What she also did—at a minimum—although she did not testify to it, was *look at* the front page where the Ford article was most likely to be. While sitting there, drinking her morning coffee, newspaper open—she said she *did not* read the Ford article. But she did turn to the very page, the last page of that newspaper section, where the Ford article was continued, the only page which had Ford's photograph which she testified to seeing, and which had a caption most like the one she remembered: *Killer. Jury Convicts Officer.*

No innocent explanation was offered for this conduct.

That Juror Cornick did not read the article itself is, of course, without significance. It merely told what she already knew—details of the crime and trial.

Also without doubt is Juror Cornick's appreciation that the story, as well as the headline and accompanying Ford photograph, was forbidden to her. When asked if she had read the article she said, "No, no because I would have got killed, no." More than forbidden, Juror Cornick appreciated that this *Killer. Jury Convicts Officer [Ford]*" information was critically important. So important that, to hide it, she committed a second intentional act of misconduct.

Later, that same morning, when explicitly asked by the judge to raise her hand if she had "see[n] . . . any publicity about this case, specifically on Mr. Ford"—Juror Cornick did not move. She intentionally misled the trial court, counsel, and the defendant.

Thereafter, Ms. Cornick refused to sign a declaration describing her misconduct; refused to testify at the first new trial hearing, asserting a self-incrimination privilege; and refused to testify at the second new trial hearing until granted immunity.

As to the significance and effects of Juror Cornick improperly discovering the other jury had convicted Ford of conspiring with Von Villas to murder Thomas Weed and of murdering him, I suggest the following.

*The Ford guilty verdicts meant Von Villas was guilty.*

Except for an ambiguous fragment of Ford's in-jail conversation with his wife and the seizure of a shotgun and ammunition from Ford's residence, Juror Cornick heard all the prosecution's evidence against Ford. That evidence made clear that although Ford *could* be innocent if Von Villas was guilty, *Von Villas* could not be innocent if Ford was guilty.

It was Von Villas, not Ford, who was linked to Ms. Ogilvie, an alleged coconspirator who had pleaded guilty to complicity in the murder of her estranged husband. It was Von Villas whom Joyce Reynolds and her daughter, Julie Rabold, recommended as a hit man to Ms. Ogilvie. Von Villas whom they had known for 13 years, not Ford whom they didn't know at all. It was Von Villas who was given Ms. Ogilvie's telephone number by Joyce Reynolds, Von Villas who telephoned Ms. Ogilvie, Von Villas who did the talking when he and Ford first met with Ms. Ogilvie, Von Villas who negotiated the $20,000 fee, received the installment payments, obtained the victim's photograph and car description, and thereafter used the Mr. Ory alias, the name of his high school friend.

To Juror Cornick the Ford guilty verdicts meant, as they would to any reasonable person, the 12 Ford jurors unanimously believed beyond a reasonable doubt that Von Villas was guilty.

*The Ford jury had special influence on Juror Cornick.*

Ms. Cornick had many reasons to be influenced by the Ford jurors. Like her, they were ordinary citizens who had sworn to be impartial and fair. Like her, month after month, they shared the same courtroom, took the same recesses, heard the same admonitions, listened to virtually the same evidence, and observed the same defendants. Now, by their verdicts, they announced they had deliberated and had weighed and considered all the evidence, and all 12 believed Ford had conspired with Von Villas to murder the victim.

In such circumstances, it is difficult to imagine Ms. Cornick was not influenced by the unanimous judgment of her 12 peers.

*No admonition to disregard.*

Because Juror Cornick intentionally misled the judge into believing no further admonition was required, none was given. Of course, no inquiry was made *whether* Juror Cornick *could* have obeyed such an admonition, had one been given.

*No substitution of alternate juror for Juror Cornick.*

Had Juror Cornick timely divulged her misconduct, presumably an available alternate juror could have been substituted for her.

*11-person jury.*

Had an alternate juror not been available, appellant—had he known of Juror Cornick's misconduct—might have consented to an 11-person jury.

*Reaction to Von Villas defense evidence.*

Unlike her 11 fellow jurors listening to Von Villas present evidence that he did not conspire with Ford, Juror Cornick knew Ford had been found guilty of conspiring with Von Villas. It is difficult to imagine that such knowledge had no influence on her reaction to the defense evidence.

In a similar context Justice Traynor observed, "A jury cannot 'segregate evidence into separate intellectual boxes.' [Citation.] It cannot determine that a confession is true insofar as it admits that A has committed criminal acts with B and at the same time effectively ignore the inevitable conclusion that B has committed those same criminal acts with A." (*People* v. *Aranda* (1965) 63 Cal.2d 518, 529 [47 Cal.Rptr. 353, 407 P.2d 265].)

*Reaction to defense final argument.*

The untrustworthiness of Ms. Ogilvie was the foundation of the Von Villas defense and the theme of its closing argument. Of the 12 jurors who listened to this argument, only Juror Cornick knew that the Ford jury had already determined Ms. Ogilvie *was* trustworthy.

*Participation in the deliberations.*

Jury deliberation is a group activity. Views are expressed, evidence weighed and considered, testimony recalled, and juror positions altered by the push and pull of a free exchange. "In the absence of a showing . . . of misconduct it is presumed that the members of the jury performed their duties with fidelity to their oaths and that they obeyed the admonitions of the judge." (*People* v. *Aranda*, *supra*, 63 Cal.2d 518, 524-525.)

Juror Cornick had not been faithful to her oath and had not obeyed the admonitions of the judge. The *presumption* of *her* fidelity to duty was thus dispelled.

## JUROR MISCONDUCT: STANDARD OF REVIEW

Our Supreme Court has frequently stated the standard of review for juror misconduct, most recently in *In re Carpenter* (1995) 9 Cal.4th 634 [38 Cal.Rptr.2d 665, 889 P.2d 985]. Although these many statements of the review standard are not the same, the Supreme Court has, almost without exception, failed to acknowledge the differences or to disapprove earlier, inconsistent formulations. The result, illustrated by the *In re Carpenter* formulation, is confusion.[5]

I believe it useful to discuss the illustrative cases.

Although California courts have addressed juror misconduct issues for over a hundred years (see, e.g., *People* v. *Stokes* (1894) 103 Cal. 193, 196 [37 P. 207]), only recently have they attempted to distinguish misconduct from nonmisconduct and to formulate misconduct review standards.

*People* v. *Lambright* (1964) 61 Cal.2d 482 [39 Cal.Rptr. 209, 393 P.2d 409] reveals the undeveloped state of the law. In this murder case, the trial court told the jury they *could* read newspapers, listen to the radio, and watch television but must disregard any information they learned about the case. When a local newspaper reported the defendant had threatened to kill the victim, evidence excluded by the trial court, the trial judge refused to poll the jury and later denied a motion for new trial. The Supreme Court reversed. It stated that since the judge had authorized jurors to read newspapers ". . . it was very likely that some jurors did read the article." (*Id.* at p. 486.) This newspaper reading, although authorized by the trial judge and "innocent" (*id.* at p. 487) by the jurors, was characterized as juror misconduct. (*Id.* at pp. 486-487.) The review standard applied to this juror misconduct was that for ordinary error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

In *People* v. *Honeycutt* (1977) 20 Cal.3d 150 [141 Cal.Rptr. 698, 570 P.2d 1050] juror misconduct was unequivocal and "egregious." The defendant was charged with murder and the issue was the degree of his culpability and whether his .24 percent blood-alcohol level constituted diminished capacity. The jury foreman, early on a Monday morning before leaving for court, telephoned his attorney and asked if involuntary manslaughter was a felony or misdemeanor and what was diminished capacity. The attorney disclaimed expertise, said the judge's instructions should be followed, but did explain diminished capacity, simply but accurately, and said involuntary manslaughter was a felony which by sentence could become a misdemeanor. Defendant

---

[5]See *People* v. *Von Villas*, *supra*, 11 Cal.App.4th 175, 255-257 where the majority quote a variety of inconsistent review standards and rely on them all.

was convicted of first degree murder. The Supreme Court reversed. Its two opinions agreed there had been prejudicial misconduct but for different reasons.

Retired Chief Justice Wright (joined by Justices Tobriner, Mosk, and Sullivan, sitting by assignment) wrote the majority opinion. His analysis is simple. He stated: "It is well settled that a presumption of prejudice arises from any juror misconduct. . . . However, the presumption may be rebutted by proof that no prejudice actually resulted." (20 Cal.3d at p. 156.) The People sought to prove no prejudice resulted: juror statements indicated the foreman never mentioned his attorney conversation and the attorney's diminished capacity explanation was correct. But Chief Justice Wright found the presumption of prejudice unrebutted for two reasons: the advice that involuntary manslaughter could be made a misdemeanor was erroneous and may have influenced the juror; and ". . . the errant juror was the foreman whose perceptions and conclusions may often sway other jurors." (*Id.* at p. 158.)

Justice Richardson concurred but did not rely on the errant juror's status as foreman. He observed that in a criminal case "if a single juror . . . was prejudiced the entire verdict was infected." (20 Cal.3d at p. 161.) Because, here, a juror committed misconduct there is a presumption that juror was prejudiced. Therefore, Justice Richardson stated, the question is "whether there is any evidence in the record from which the trial court properly could have concluded that the presumption of prejudice had been rebutted." (*Ibid.*) Justice Richardson's answer was *no* because ". . . jurors could not overcome this presumption by swearing that the misconduct did not influence their verdict." (*Ibid.* Cited are *People* v. *Hutchinson* (1969) 71 Cal.2d 342 [78 Cal.Rptr. 196, 455 P.2d 132] and Evid. Code, § 1150.) Justices Clark and Thompson, sitting by assignment, joined the opinion.

*Honeycutt* is of note for several reasons. It confirmed that juror misconduct creates a presumption of prejudice. It also confirmed that the presumption of prejudice may be rebutted. But it did not explain what "prejudice" meant and what sort of evidence might rebut it. For example, Chief Justice Wright focused upon the errant involuntary manslaughter advice and its possible effect upon the juror. Justice Richardson's focus was similar. *Neither* opinion suggested that evidence of *guilt*, even overwhelming evidence of guilt, might rebut the presumption of juror prejudice. The omission was hardly inadvertent in a case where the defendant had a motive to kill, was observed by an eyewitness who implored him to stop the beating, beat and stabbed the victim for 45 minutes inflicting 143 lacerations and puncture wounds, fled when the police arrived, and was arrested 4 blocks away.

*Honeycutt* made no reference to the *Watson* review standard applied by *People* v. *Lambright.*

That omission was corrected in *People* v. *Pierce* (1979) 24 Cal.3d 199 [155 Cal.Rptr. 657, 595 P.2d 91]. Here, the defendant bludgeoned to death his gas station employee and was convicted of second degree murder. During the trial, the jury foreman went to the house of Officer Case, a trial witness and friend of his, and received information about fingerprints, why certain photographs had not been shown to the jury, and other matters. Based upon the foreman's misconduct, the defendant moved for new trial. The court, using the *Watson* standard, denied the motion.

Justice Mosk, writing for a unanimous court, held *Watson* was "an incorrect standard of prejudice in the circumstances" (but did not cite or overrule *People* v. *Lambright*) (*People* v. *Pierce, supra,* 24 Cal.3d at p. 207.) As to the correct test, Justice Mosk merely stated ". . . jury misconduct raises a presumption of prejudice; and unless the prosecution rebuts that presumption by proof that no prejudice actually resulted, the defendant is entitled to a new trial." (*Ibid.*) As in *Honeycutt,* evidence of guilt was *not* considered in determining whether or not prejudice was rebutted.

*Pierce* also held, citing Justice Richardson's concurring opinion in *Honeycutt,* ". . . a conviction cannot stand if even a single juror has been improperly influenced." (24 Cal.3d at p. 208.)

*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388 [185 Cal.Rptr. 654, 650 P.2d 1171] sharply departed from *Honeycutt* and *Pierce.* Here the principal claimed juror misconduct was protracted inattentiveness by several jurors who read books or did crossword puzzles during the trial. Justice Mosk, again writing for the court, agreed the juror inattentiveness constituted misconduct. But, unlike *Honeycutt* and *Pierce,* Justice Mosk did not invoke a presumption of prejudice. Instead he stated juror inattentiveness "is a *form of misconduct* which will justify the granting of a new trial *if* shown to be prejudicial to the losing party." (*Id.* at p. 411, italics added.) And later, that "[t]he presumption of prejudice is an evidentiary aid to those parties who are able to establish *serious misconduct* of a type likely to have had an effect on the verdict or which deprived the complaining party of thorough consideration of his case, yet who are unable to establish . . . actual prejudice occurred." (*Id.* at p. 416, italics added.)

Thus, although juror misconduct had been established and there was no effective rebutting evidence, the judgment was affirmed. This result was achieved by reincarnating the *Watson* test (having been buried three years earlier in *Pierce*). In doing so, *Hasson* did not overrule "*Honeycutt's* presumption of prejudice [rule] . . . because Ford does not prevail even if aided by the presumption." (32 Cal.3d at p. 416, fn. 9.)

After holding that juror misconduct review is the same for civil and criminal cases (32 Cal.3d at p. 417), *Hasson* formulated this review standard: "[T]he presumption [of prejudice] is not conclusive; it may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct. [Citations.] Some of the factors to be considered when determining whether the presumption is rebutted are the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." (*Id.* at p. 417, fn. omitted.)[6]

Thus, according to the new *Hasson* review standard for juror misconduct, the presumption of prejudice could be overcome in either of two ways. First, by showing at the evidentiary hearing (where juror misconduct is proved) that the misconduct was neither serious nor likely to have caused "actual prejudice." Second, by considering "the entire record" and determining if there is a reasonable probability the result, absent the misconduct, would have been different. (The *Watson* standard.)

This dual standard soon proved difficult to employ when the issue of juror misconduct was raised not on appeal but by a habeas corpus petition. The petitioner in *In re Stankewitz* (1985) 40 Cal.3d 391 [220 Cal.Rptr. 382, 708 P.2d 1260] had been convicted of first degree murder and robbery and sentenced to death. His automatic appeal to the Supreme Court was pending. His habeas corpus petition included juror declarations stating that Juror Knapp told the other jurors he had been a police officer for 20 years, knew the law, and a robbery was committed as soon as a person forcibly takes another's personal property, whether or not he intends to keep it.

This erroneous statement of law, contrary to the court's instructions, was misconduct (cf. *People* v. *Pierce, supra*) and prejudicial, Stankewitz claimed, because the prosecution had relied on a robbery (felony-murder) theory to convict him of first degree murder. Further, the intent element of robbery was disputed.

In deciding the juror misconduct issue, *In re Stankewitz* did not use the recently formulated *Hasson* test. It may have been impractical to do so because the record on appeal may not have been filed and therefore could not, as *Hasson* required, be considered. (Cf. *In re Carpenter, supra*, 9 Cal.4th 634.) Instead, it applied the *Honeycutt-Pierce* test: juror misconduct raises a presumption of prejudice which, if unrebutted, entitles the defendant to a new trial. Since, here, the presumption was unrebutted the petition was granted.

---

[6]Justice Richardson, noting the majority's departure from *Honeycutt* and *Pierce*, dissented.

In addition to reviving the *Honeycutt-Pierce* test and suspending the *Hasson* test, *In re Stankewitz* newly suggested that presumptions of prejudice had different "strengths" and were "stronger" when "the misconduct goes to a key issue" and " 'even stronger in . . . a capital case.' " (*In re Stankewitz, supra*, 40 Cal.3d at p. 402.)

Two years later, with Justice Panelli writing for the court, another review standard variation was suggested. In *People v. Miranda* (1987) 44 Cal.3d 57 [241 Cal.Rptr. 594, 744 P.2d 1127] the defendant's girlfriend had several long telephone conversations with a young, male juror. Claiming juror misconduct, the defendant moved for a new trial. The motion was denied. On automatic appeal from a death sentence, the Supreme Court reviewed the juror misconduct claim by combining *Honeycutt-Pierce-Stankewitz* with *Hasson*, omitting the *Hasson* factors, and adding new factors (from *People v. Martinez* (1978) 82 Cal.App.3d 1, 22 [147 Cal.Rptr. 208]). It stated the test this way: "Jury misconduct raises a presumption of prejudice, and ' "unless the prosecution rebuts that presumption . . . , the defendant is entitled to a new trial." ' (*In re Stankewitz* (1985) 40 Cal.3d 391, 402 [220 Cal.Rptr. 382, 708 P.2d 1260]; *People v. Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91]; *People v. Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050].) The presumption of prejudice 'may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party. . . .' (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171].) Whether a defendant has been prejudiced by a juror's outside communications depends upon 'whether the jury's impartiality has been adversely affected, whether the prosecution's burden of proof has been lightened and whether any asserted defense has been contradicted.' (*People v. Martinez* (1978) 82 Cal.App.3d 1, 22 [147 Cal.Rptr. 208]; see e.g., *People v. Pierce, supra*, at pp. 207-209; *People v. Honeycutt, supra*, 20 Cal.3d at pp. 157-158.)" (*People v. Miranda, supra*, 44 Cal.3d at p. 117.)

*Miranda* made no reference to prejudice presumption "strengths" nor to their being "even stronger" (*In re Stankewitz, supra*, 40 Cal.3d at p. 402) in capital cases.

Just three years later, the Supreme Court departed from *Hasson-Miranda* and employed a new review standard. In *People v. Marshall* (1990) 50 Cal.3d 907 [269 Cal.Rptr. 269, 790 P.2d 676] a juror committed misconduct by introducing extraneous and erroneous law into death penalty deliberations. He asserted " 'lack of evidence did not mean the defendant has no criminal background, because juvenile records are automatically sealed at 18 years of age.' " (*Id.* at p. 949.)

Justice Mosk, again writing for the court, stated defendant had shown juror misconduct, thus prejudice is presumed, and ". . . the state must then rebut the presumption or lose the verdict." (50 Cal.3d at p. 949.)

In then addressing whether or not the presumption of prejudice had been rebutted, Justice Mosk eschewed the *Hasson-Miranda* dual test, stating, "We believe that the question should be resolved through the following prejudice analysis.

"A judgment adverse to a defendant in a criminal case must be reversed or vacated 'whenever . . . the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury.' (2 ABA Standards for Criminal Justice, std. 8-3.7 (2d ed. 1980) p. 8.57; [citations].). . . .

" 'The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror.' (2 ABA Standards for Criminal Justice, *supra*, std. 8-3.7, Commentary, p. 8.58.)

"Such 'prejudice analysis' is different from, and indeed less tolerant than, 'harmless-error analysis' for ordinary error at trial. The reason is as follows. Any deficiency that undermines the integrity of a trial—which requires a proceeding at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury—introduces the taint of fundamental unfairness and calls for reversal *without consideration of actual prejudice*. (See *Rose* v. *Clark* [(1986)] 478 U.S. [570] at pp. 577-578 [92 L.Ed.2d 470-471].) Such a deficiency is threatened by jury misconduct. When the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment, we are compelled to conclude that the integrity of the trial was undermined: under such circumstances, we cannot conclude that the jury was impartial. By contrast, when the misconduct does not support such a finding, we must hold it nonprejudicial." (*People* v. *Marshall, supra,* 50 Cal.3d at pp. 950-951, italics added.)

This explicit disavowal of the *Watson* "harmless-error" test, for the second time (*People* v. *Pierce, supra,* 24 Cal.3d 199, 207), was a silent disapproval of *Hasson-Miranda* which both incorporated it in their dual test.

The American Bar Association (ABA) standards test unanimously adopted by *Marshall,* was not a dual test. It solely focused on juror prejudice. If by exposure to extraneous information a juror was *"influenced"* to vote

guilty then reversal was required. Overpowering evidence of guilt could not save the judgment because such a "deficiency . . . undermines the integrity of a trial . . . ." (*People* v. *Marshall, supra,* 50 Cal.3d at p. 951.) Reversal is required "without consideration of actual prejudice." (*Ibid.*)

In *Marshall,* the juror misconduct was found not to have influenced a juror because the trial court's instructions made the juror's errant comment immaterial. (50 Cal.3d at p. 951.)

Two weeks after *Marshall,* the Supreme Court applied its new review standard in *People* v. *Holloway* (1990) 50 Cal.3d 1098 [269 Cal.Rptr. 530, 790 P.2d 1327]. Acknowledging that "[u]ntil recently it was unclear what standard should be applied in criminal cases to determine whether the presumption of prejudice has been rebutted" (*Id.* at p. 1109), that uncertainty, *Holloway* noted, was resolved by *Marshall*'s adoption of the ABA Standards test.

*Holloway* faithfully applied that test to its facts. In *Holloway,* a double murder, death penalty case, a juror read a newspaper and learned defendant was on parole for assaulting a woman with a hammer. Defendant did not testify and evidence of guilt was overwhelming.

Applying the *Marshall* review standard for juror misconduct, the Supreme Court unanimously reversed the judgment. It stated presumed prejudice of one juror was not rebutted because "that 1 juror went through the entire guilt phase contaminated by knowledge of what had been judicially determined to be inadmissible and prejudicial information. His silence exacerbated matters because it prevented the court and counsel from taking any action to remedy the situation. Thus, the defense had no opportunity to request curative measures such as replacement of the tainted juror with an alternate or a limiting instruction or admonition." (50 Cal.3d at p. 1111.) It concluded, "We cannot say at this point that Juror Beck's improper knowledge had no impact." (*Ibid.*)

A year later the Supreme Court again considered alleged juror misconduct. In *People* v. *Cooper* (1991) 53 Cal.3d 771 [281 Cal.Rptr. 90, 809 P.2d 865], a multiple murder, death penalty case, an exhibit "was 'inadvertently' admitted into evidence at the defense's request." (*Id.* at p. 834.) It indicated defendant, at an earlier time, had experienced headaches and hallucinations. When the jury was considering that exhibit during their guilt deliberations, a juror stated she " 'knew personally that there was supposed to have been a mental problem with [the defendant] . . . .' " (*Ibid.*)

As to the exhibit, Justice Arabian, writing for a five-justice majority, stated there was no juror misconduct. The exhibit had been admitted, if

inadvertently, given to the jury, and properly examined by them. It was the jury who raised the question concerning the exhibit. Such an error, *not* involving jury misconduct, was subject to ordinary harmless error. Justices Broussard and Mosk dissented. They observed that the ABA-*Marshall-Holloway* test applied when jurors were exposed to *any* extraneous prejudicial matter, regardless of juror innocence or culpability.

As to the juror's statement of extraneous personal knowledge, *Cooper* applied the ABA-*Marshall-Holloway* review standard and found the presumption of prejudice rebutted. (53 Cal.3d at p. 838.)

The comparative clarity of *Marshall-Holloway-Cooper* would last less than a year. *People* v. *Hardy* (1992) 2 Cal.4th 86 [5 Cal.Rptr.2d 796, 825 P.2d 781], an extremely lengthy death penalty opinion, blurred the review standard for juror misconduct. It did so by considering the significance of a juror, in open court, silently giving a handsome police officer witness for the prosecution a gift of fruit cocktail. *Hardy*, apparently characterizing the gift giving as juror misconduct, and acknowledging it gave rise to a presumption of prejudice, invoked the superceded *Hasson-Stankewitz-Miranda* test combined with a dash of *Marshall* ("substantial likelihood") to find prejudice rebutted. *Hardy* stated, "The presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm. ([*People* v. *Miranda* (1987) 44 Cal.3d 57, 117 (241 Cal.Rptr. 594, 744 P.2d 1127)]; *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1108-1110 [269 Cal.Rptr. 530, 790 P.2d 1327].)" (*People* v. *Hardy*, *supra*, 2 Cal.4th at p. 174.)

Its citation to *Holloway* as support for the review standard it applied is entirely mistaken.

When *Hardy* rejected another instance of claimed jury misconduct it used different language. It stated, "On examining the entire record, we find no reasonable probability defendants suffered actual prejudice (*Miranda*, *supra*, 44 Cal.3d at p. 117)." (*People* v. *Hardy*, *supra*, 2 Cal.4th at p. 177.) In this formulation *Marshall*'s "substantial likelihood" was replaced by *Miranda*'s "reasonable probability."

Why *Hardy* leapfrogged its three most recent, carefully reasoned juror misconduct opinions (*Marshall, Holloway,* and *Cooper*), which had brought certainty to an area of legal chaos, to reinvoke a superceded review standard (*People* v. *Miranda*), is a mystery.

*In re Hitchings* (1993) 6 Cal.4th 97 [24 Cal.Rptr.2d 74, 860 P.2d 466] did little to solve the *Hardy* mystery or restore clarity to juror misconduct review.

Hitchings had been convicted of murdering two elderly victims in their Loleta home, a town only a few miles from Eureka. The victims, Hitchings's family, and officers involved in the case all frequented, or had frequented, the First Security Savings and Loan (the bank) in Eureka. The arrest of Hitchings, his prosecution, and his trial were the subject of daily, intense conversation among bank employees. One bank employee, Cathy Nordstrom, served on the jury. In his habeas corpus petition, Hitchings alleged Cathy Nordstrom had committed misconduct by concealing, on voir dire, her knowledge of the case, prejudging the case, and improperly discussing the case during trial with nonjurors. The Supreme Court appointed a referee and adopted two of his findings: the juror had concealed her knowledge about the case on voir dire and had, during the trial, discussed the case with nonjurors. The Supreme Court rejected a third finding that the juror had not prejudged the case.

*Hitchings* stated there were two acts of juror misconduct (voir dire concealment and during-trial discussion about the case) and prejudice was presumed from each. *Hitchings* then quoted the ABA-*Marshall-Holloway* review standard, citing *Marshall* and *Holloway*. (6 Cal.4th at pp. 118-119.) Almost immediately thereafter, without any apparent awareness of the inconsistency, it also quoted the *Miranda* review standard (prejudice " ' "may be rebutted . . . by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm . . . .' " " (*Id.* at p. 119.)

*Hitchings*, although quoting two inconsistent review standards with apparent equal approval, applied only one, the ABA-*Marshall-Holloway* test, found prejudice unrebutted, and granted the petition for a new trial.

Finally, we consider *In re Carpenter*, *supra*, 9 Cal.4th 634, the Supreme Court's most recent, divided (four to three), and confusing opinion.

A brief summary will be helpful. In 1980 and 1981 there were multiple trailside murders committed in both Santa Cruz and Marin Counties. All the murders were committed in a similar way, apparently by the same killer. Carpenter was first tried and convicted for the Santa Cruz murders.

He was then, in the subject case, tried for the Marin County murders. Evidence of the Santa Cruz murders was admitted but evidence that Carpenter had been convicted of them and sentenced to death was excluded. The issue at trial was *who* had committed all these multiple county murders, not whether the same person had committed them.

During the guilt phase of the subject trial, the forewoman learned from newspapers and from her husband that Carpenter had been convicted of the Santa Cruz murders and had been sentenced to death. The forewoman said nothing to the trial court about obtaining this extraneous information but boasted of it, during trial, at dinner with social acquaintances. Carpenter was convicted of the Marin County murders and sentenced to death.

Shortly thereafter, Carpenter filed a habeas corpus petition with the trial court based upon the forewoman's misconduct. The trial court conducted evidentiary hearings, made factual findings, granted the petition, and vacated the judgment. The Director of Corrections appealed the granting of the habeas corpus petition to the California Supreme Court.

Justice Arabian began his legal discussion by examining four United States Supreme Court decisions (see *In re Carpenter, supra*, 9 Cal.4th at pp. 647-650) none of which involved juror-obtained extraneous information and only one, arguably, involved juror misconduct. (*McDonough Power Equipment, Inc.* v. *Greenwood* (1984) 464 U.S. 548 [78 L.Ed.2d 663, 104 S.Ct. 845].) What this quartet had in common was an understandable reluctance to overturn verdicts based upon miscellaneous, common, and almost unavoidable trial imperfections.

"With these decisions as a backdrop" (*In re Carpenter, supra*, 9 Cal.4th at p. 650), Justice Arabian turned to the three cases relied upon by Carpenter: *Marshall, Holloway*, and *Hitchings.*

*Marshall* was summarized and its juror misconduct review standard quoted in full, apparently with complete approval. (9 Cal.4th at pp. 650-651.)

Similarly, *Holloway* was summarized, Justice Arabian noting that "[w]e then applied the test of *People* v. *Marshall* . . . and found the misconduct prejudicial." (9 Cal.4th at p. 652.) *Holloway* also, from all appearances, earned complete approval.

The reference to *Hitchings* was brief, Justice Arabian stating only: "Our most recent decision involving juror misconduct was *In re Hitchings, supra*, 6 Cal.4th 97. There, during voir dire, a juror intentionally concealed knowledge she had about the case and, during the guilt trial, she made statements to a nonjuror indicating that she already believed the defendant was guilty. (*Id.* at pp. 116, 117.) This was clearly misconduct giving rise to the presumption of prejudice. 'This presumption of prejudice " 'may be rebutted by an affirmative evidentiary showing that prejudice does not exist *or by a*

*reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm* to the complaining party [resulting from the misconduct]. . . .' " ' (*Id.* at p. 119, quoting *People* v. *Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127], which itself quoted *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171], italics added.) We found the presumption had not been rebutted because the evidence showed it to be ' "reasonably probable" [the juror] had prejudged the case.' (*In re Hitchings, supra,* 6 Cal.4th at p. 121.)" (9 Cal.4th at p. 653, italics added by Justice Arabian.)

Omitted is *Hitchings*'s full quotation of and reliance upon the *Marshall-Holloway* review standard. *(In re Hitchings, supra,* 6 Cal.4th at pp. 118-119.)

Also, in referring to *Hitchings*'s quotation of the *People* v. *Miranda* review standard, Justice Arabian does not mention that *Hitchings* did not and could not[7] apply the *People* v. *Miranda* review standard and its quotation was needless (and confusing) dictum.

Justice Arabian then purports to summarize the *Marshall, Holloway,* and *Hitchings* holdings, as follows: "To summarize, when misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. (E.g., *People* v. *Holloway, supra,* 50 Cal.3d at pp. 1110-1112; *People* v. *Marshall, supra,* 50 Cal.3d at pp. 951-952.) Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. (E.g., *In re Hitchings, supra,* 6 Cal.4th at p. 121.) The judgment must be set aside if the court finds prejudice under either test." (*In re Carpenter, supra,* 9 Cal.4th at p. 653.)

The summary is more than inaccurate, it is irreconcilable with *Marshall, Holloway,* and *Hitchings.* These three cases hold, as do a legion of earlier ones, that juror misconduct, such as the receipt of extraneous information, raises a *presumption* of prejudice. Quite apart from and prior to any "review of the entire record" the misconduct itself raises a presumption of prejudice which requires a reversal unless rebutted. This fundamental principle is omitted from Justice Arabian's summary.

---

[7]The *People* v. *Miranda* review standard requires a review of the entire trial record. In the *Hitchings* habeas corpus proceeding there is no indication the court had such a record and every indication the court did not review it.

Moreover, *the* ABA-*Marshall-Holloway* review standard focuses solely on the "vote of one or more jurors" and whether or not it " 'was influenced by exposure to prejudicial matter . . .' not part of the trial record." (*People* v. *Marshall, supra,* 50 Cal.3d 907 at p. 951; *People* v. *Holloway, supra,* 50 Cal.3d at p. 1109.) If it was "[a] verdict of guilty must be reversed or vacated" (*ibid.*) and no "review of the entire record" can save the verdict. Justice Arabian states the opposite.

Further, the ABA-*Marshall-Holloway* review standard refers not to juror "bias" but to juror "influence."

Additionally, *Marshall* and *Holloway* apply the review standard not to determine whether prejudice has been shown, as does Justice Arabian, but to determine whether it has been *rebutted.*

Finally, Justice Arabian splits the simple, clear *single* ABA-*Marshall-Holloway* test (was a juror's vote *influenced* by exposure to extraneous matter) into a complicated, confusing, two-prong test.

As to the first prong, Justice Arabian states it is "analogous to . . . harmless error analysis." (*In re Carpenter, supra,* 9 Cal.4th at p. 653.) In contrast, *Marshall* states its standard "is different from, and indeed less tolerant than, 'harmless error analysis.' " (*People* v. *Marshall, supra,* 50 Cal.3d at p. 951.)

In describing his second prong, Justice Arabian begins by incorporating *Marshall*'s "was a juror's vote influenced" test, and ends by eviscerating it.

For Justice Arabian, by either prong, the bottom line is harmless-error analysis. Regardless of how influential the extraneous matter was on a juror's vote, overwhelming guilt evidence will save the verdict. One example will suffice.

Justice Arabian, in explaining that the trial court incorrectly found juror prejudice, stated: "To be sure, once actual bias is found, the strength of the evidence is irrelevant; the verdict must be set aside. But such evidence is relevant in determining bias in the first place. Contrary to the dispositive finding of the court below, if the evidence was truly overwhelming, the extraneous information *cannot* be considered 'inherently' prejudicial." (*In re Carpenter, supra,* 9 Cal.4th at p. 655, italics added.)

*Compare* Justice Arabian's statement that if the guilt evidence is overwhelming a juror cannot be biased *with Marshall*'s statement that "[a]*ny*

deficiency that undermines the integrity of a trial . . . introduces the taint of fundamental unfairness and calls for reversal *without consideration of actual prejudice.*" (*People* v. *Marshall, supra,* 50 Cal.3d at p. 951, italics added.)

Other oddities abound. Repeatedly, Justice Arabian emphasizes the "substantial likelihood" proof standard of *Marshall-Holloway* but when he purports to apply that proof standard he departs from it by adding a new element. He states: "We also find that the surrounding circumstances *do not necessarily* reveal a substantial likelihood the juror actually was impermissibly influenced by the outside information." (*In re Carpenter, supra,* 9 Cal.4th at p. 655, italics added.)

Another oddity is Justice Arabian's characterization of and reaction to the juror's false denial to the trial court. He stated, "The juror also failed to report what she had learned, as she should have. But to the extent this was misconduct, it was also *passive.* Having learned what she should not, she chose—improperly to be sure—to keep it to herself. But this alone does not show bias." (9 Cal.4th at p. 656, italics in original.)

Justice Arabian had reacted differently to juror oath violation only four years before. Then he wrote, "When a person violates his oath as a juror, doubt is cast on that person's ability to otherwise perform his duties. [Citation.] The presumption of prejudice is appropriate in those situations." (*People* v. *Cooper, supra,* 53 Cal.3d 771, 835-836.)

Still another oddity is Justice Arabian's analysis of the juror's nondisclosure to fellow jurors that she had violated the judge's instructions and learned what she had been forbidden to learn. Justice Arabian stated this nondisclosure "is probative in two important respects. First, it tends to negate the inference the juror was biased; a biased juror would likely have told other jurors what she had learned. Second, it tends to show the juror intended the forbidden information *not* to influence the verdict." (*In re Carpenter, supra,* 9 Cal.4th at p. 657, italics in original.) With all due respect, the inferences appropriate to this nondisclosure are, in my view, opposite to those suggested by Justice Arabian.

Finally, there is the disposition oddity. Justice Arabian acknowledged "that the respondent below did not present affirmative evidence showing there was no prejudice" (9 Cal.4th at p. 657) *and* that the Supreme Court (in this habeas corpus proceeding) could not and did not review the entire record to determine prejudice but nevertheless reversed the judgment. Carpenter

was given leave to file another petition once the appellate record had been certified.

Having thus discussed the significant California Supreme Court cases, what *is* the review standard for juror misconduct involving exposure to extraneous information? During the last three decades, from *Lambright* to *Carpenter*, our Supreme Court has propounded three different review standards, plus multiple variations. A trio of recent cases, *Marshall, Holloway,* and *Cooper*, all subscribe to the ABA standard for such review. (*People v. Marshall, supra,* 50 Cal.3d at pp. 950-951.) *Carpenter*, the most recent and divided Supreme Court opinion, approved *Marshall, Holloway,* and *Cooper*, found them distinguishable, and applied a different review standard.

I recognize and accept the core principle of stare decisis: "Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court." (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

I accept "the law declared by courts of superior jurisdiction" but as to a juror misconduct review standard, I am uncertain what law has been declared.

### STRUCTURAL DEFECTS

Our courts have long recognized that certain errors are so fundamental they constitute "structural defects" not curable by overwhelming evidence of guilt. Justice George recently observed, ". . . in some instances an error may result in a 'miscarriage of justice' within the meaning of the California [Constitution] without regard to the strength of the evidence presented at trial, because . . . '[w]hen we speak of administering "justice" in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined *by an orderly legal procedure*, in which the substantial rights belonging to defendants shall be respected.' . . . But the kinds of errors that, regardless of the evidence, may result in a 'miscarriage of justice' because they operate to deny a criminal defendant the constitutionally required 'orderly legal procedure' (or, in other words, a fair trial)—for example, the denial of the defendant's right to a jury trial or to an impartial trial judge . . . —all involve fundamental 'structural defects' in the judicial proceedings, analogous to those to which the United States Supreme Court referred

in its *Fulminante* decision . . . , rather than the improper admission of a particular item of evidence." (*People* v. *Cahill* (1993) 5 Cal.4th 478, 501-502 [20 Cal.Rptr.2d 582, 853 P.2d 1037], citations omitted.)

In *Fulminante* (*Arizona* v. *Fulminante* (1991) 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246]) Chief Justice Rehnquist cited two such "structural defects," deprivation of the right to counsel at trial and a judge who was not impartial, and then enumerated still others. He stated, "These are structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards. The entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant, just as it is by the presence on the bench of a judge who is not impartial. Since our decision in *Chapman*, other cases have added to the category of constitutional errors which are not subject to harmless error the following: unlawful exclusion of members of the defendant's race from a grand jury, *Vasquez* v. *Hillery*, 474 U. S. 254 (1986) [88 L.Ed.2d 598, 106 S.Ct. 617]; the right to self-representation at trial, *McKaskle* v. *Wiggins*, 465 U. S. 168, 177-178, n. 8, (1984) [79 L.Ed.2d 122, 104 S.Ct. 944]; and the right to public trial, *Waller* v. *Georgia*, 467 U. S. 39, 49, n. 9, (1984) [81 L.Ed.2d 31, 40, 104 S.Ct. 2210]. Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. 'Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " (*Arizona* v. *Fulminante, supra,* 499 U.S. 279, 309-310 [113 L.Ed.2d 302, 331].)

Surely no less a part of "the framework within which the *trial* proceeds" (499 U.S. at p. 310 [L.Ed.2d at p. 331]) is an unbiased jury. "Trying a defendant before a biased jury is akin to providing him no trial at all. It constitutes a fundamental defect in the trial mechanism itself . . . . [¶] . . . [T]he innocent and the guilty are entitled to start a trial without any member of the jury convinced of the defendant's guilt." (*Johnson* v. *Armontrout* (8th Cir. 1992) 961 F.2d 748, 755.)

Our Supreme Court has stated: " 'The right to a fair and impartial jury is one of the most sacred and important of the guaranties of the Constitution. Where it has been infringed, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be set aside.' " (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 283 [148 Cal.Rptr. 890, 583 P.2d 748].)

In my view, appellant was denied his right to a fair and impartial jury when a juror intentionally obtained extraneous information that appellant's

codefendant had been convicted of conspiring with him and then the juror falsely denied to the trial court that she had obtained the forbidden information. The forbidden information was "of a type that would leave an inerasable impression." (*People* v. *Lambright, supra,* 61 Cal.2d at p. 486.)

It was extraneous information which, as a matter of law she could not consider, but as a matter of fact, she could not forget. (See *People* v. *Aranda, supra,* 63 Cal.2d 518, 525-526.)

Accordingly, I would reverse the judgment.

A petition for a rehearing was denied August 9, 1995. Woods, J., was of the opinion that the petition should be granted. Appellant's petition for review by the Supreme Court was denied November 2, 1995. George, J., did not participate therein. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.